Manuel Monclova como Trustee de Soler & Mascaró Auto Corporation, en quiebra, demandante y recurrente, *v.* Financial Credit Corporation, demandada y recurrida.

Número: 12213. Resuelto: 8 de noviembre de 1961.

772

Salvador Suau y Rafael Martínez Álvarez, Jr., abogados del recurrente; Juan Enrique Géigel, Guillermo Silva, Jaime A. García y Hernán G. Pesquera, abogados de la recurrida; Beverly, Castro & López Baralt, Iván Reichard y Maurice Ravage, como amici curiæ.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En su carácter de síndico (trustee) de la corporación en quiebra Soler & Mascaró Auto Corporation, Manuel Monclova inició una acción civil ante el Tribunal Superior, Sala de San Juan, contra Financial Credit Corporation, en la cual, en síntesis, ejercita seis reclamaciones que pueden resumirse en la siguiente forma:

(a) Sostiene que un contrato denominado "dealer's retail agreement", fue simulado; redactado y otorgado para encu-

brir operaciones de préstamo con intereses usurarios, y que, por este último concepto, Soler & Mascaró Auto Corporation pagó a la demandada, y ésta debe devolverle, la suma de $150,000;

(b) Que, de conformidad con los términos de dicho acuerdo, la demandada retuvo indebidamente dineros pertenecientes a la corporación en quiebra, los utilizó para su propio beneficio, y la ganancia obtenida, así como los beneficios que dicha ganancia a su vez produjo, ascendieron a $251,200.00, que la demandada debe también devolver a la parte demandante;

(c) Que, al reposeer y vender vehículos de motor sujetos a contratos de venta condicional que Financial Credit Corporation adquirió de Soler & Mascaró Auto Corporation, dicha demandada incurrió en gastos extraordinarios e innecesarios ascendentes a la suma de $80,000, que indebidamente cargó en cuenta a la corporación en quiebra, y que debe devolver a la parte demandante;

(d) Que, por falta de pago de las primas correspondientes, la compañía aseguradora canceló ciertos seguros que cubrían vehículos vendidos a plazos y en poder de los compradores condicionales; que el importe de dichas primas ascendente a $5,217.74, que había sido cobrado por Soler & Mascaró Auto Corporation a los compradores de los vehículos, les fue devuelto a éstos por Financial Credit Corporation, que a su vez lo cargó a la corporación en quiebra, actuación ésta que se alega indebida, y por lo cual se reclama la devolución de la cantidad mencionada de $5,217.74;

(e) Que, para beneficio exclusivo de la demandada, ésta requirió a Soler & Mascaró Auto Corporation la obligación de utilizar los servicios del Lic. Juan Enrique Géigel, y que por esta razón pagó $600.00 que la demandada debe reintegrar al demandante; y

(f) Que, como consecuencia de las actuaciones alegadas precedentemente bajo los párrafos (a) y (b), la demandada

·ocasionó la quiebra de Soler & Mascaró Auto Corporation oca-sionándole con ello daños y perjuicios que se valoran en la suma de $1,600,000.

La demandada contestó la demanda y adujo ciertas defensas especiales. Celebrado el juicio correspondiente, que se prolongó durante varios días y durante el cual se presentó abundante evidencia oral y documental—la transcripción de evidencia elevada ante este Tribunal consta de ocho piezas separadas, con un total de 2,651 folios—el tribunal de instancia dictó sentencia declarando sin lugar las reclamaciones reseñadas bajo las letras (a), (b), (e) y (f), y desestimó las marcadas con las letras (c) y (d), sin adjudicarlas en forma definitiva, y sin perjuicio de que se reprodujeran dentro del procedimiento de quiebra. Para la mejor disposición del presente recurso de apelación hemos unido como Apéndice "A" de esta opinión una transcripción de las determinaciones de hecho del juez recurrido. Difícilmente puede superarse el cuidadoso análisis de la prueba que resulta de estas determinaciones. Por otro lado, el cuadro completo de la situación de hechos que surge de las mismas es sumamente apropiado para la consideración de las varias cuestiones de derecho que se plantean. A ellas nos remitiremos, pues, en el curso de la discusión.

Doce errores se plantean en el recurso de apelación entablado por la parte demandante. Del señalamiento indicado se deduce que no se insiste en las reclamaciones reseñadas anteriormente bajo las letras (e) y (f), o sea, las relativas al pago de los servicios prestados por el abogado Juan E. Géigel y a los daños y perjuicios causados por la demandada al precipitar la quiebra de la demandante.

## I

En un orden lógico procede discutir previamente si en el otorgamiento del "dealer's retail agreement" medió fraude de la demandada Financial Credit Corporation o desconoci-

miento de sus términos por parte de Soler & Mascaró Auto Corporation, como apunta y superficialmente discute el apelante en el octavo error.

Para enfrentarnos a este planteamiento es preciso reiterar que el fraude no se presume, *Feliciano* v. *P. Cedeño, S. en C.*, 78 D.P.R. 39 (1955) ; *Byars* v. *Cherokee County*, 118 S.E.2d 324 (S.C. 1961) ; *Newell* v. *Rountree Olds-Cadillac Co.*, 129 So.2d 599 (La. 1961) ; *Sutherland* v. *Sutherland*, 358 P.2d 776 (Kan. 1961) ; y que una conclusión sobre la existencia de fraude no puede basarse en meras conjeturas y sospechas, y debe fundarse en prueba sólida, clara y convincente, *Nine* v. *Ortiz*, 67 D.P.R. 940, 952 (1947) ; *Sucn. Gómez* v. *Colón*, 63 D.P.R. 104 (1944) ; *Serrano* v. *Torres*, 61 D.P.R. 162, 166 (1942) ; *The Texas Co.* v. *Estrada y Alvarez, Int.*, 50 D.P.R. 743, 747–8 (1936) ; *Buzard* v. *Griffin*, 358 P.2d 155 (Ariz. 1961) ; *Master* v. *Master*, 166 A.2d 251 (Md. 1960). Por supuesto, que la determinación sobre la existencia de fraude depende en gran medida de los hechos particulares de cada caso, y en el presente, las determinaciones que hizo el tribunal a quo, cuya corrección no se impugna—y que dicho sea de paso están ampliamente sostenidas por la prueba—, lejos de apoyar tal conclusión, revelan claramente que los directores de la corporación en quiebra no fueron inducidos indebidamente a firmar el contrato de referencia, que no se les hicieron representaciones falsas ni promesas engañosas, ni medió exageración de esperanzas o beneficios.

Como cuestión de realidad, la creación de la corporación demandada fue concebida originalmente por los propios directores de la corporación en quiebra como un apéndice necesario e indispensable de sus negocios principales, como el vehículo para obtener el crédito para sus ventas a plazos que no podían conseguir, debido a su capital insuficiente, de la institución bancaria que hasta entonces se lo había extendido. La demandada sirvió a estos propósitos en forma

eficaz. El mayor volumen de negocios por ella realizado fue en transacciones con Soler & Mascaró Auto Corporation, entidad a la cual se le extendió una línea de crédito que le permitió continuar la expansión de la empresa y la gestión de negocios en proporción insospechada. No nos extenderemos en puntualizar los hechos que justifican la ausencia de fraude y del supuesto desconocimiento por parte de la corporación en quiebra de los términos del acuerdo de negocios entre las partes. Nos limitaremos a referirnos a las determinaciones de hecho del juez recurrido bajo los números 2 a 12, 14 y 15, 18 y 19 de las cuales surge en forma palmaria lo injustificado de la imputación. Aparentemente se pretende que derivemos la conclusión de que medió fraude o ventaja indebida en el otorgamiento del contrato mencionado porque, en fin de cuentas, Soler & Mascaró tuvo que acogerse a un procedimiento de quiebra voluntaria y Financial Credit Corporation ha progresado singularmente en el campo de las finanzas. Pero como justificadamente concluyó el tribunal de instancia, el fracaso de Soler & Mascaró Auto Corporation se debió a prácticas administrativas deficientes, a otros factores y a actuaciones de los propios directores de dicha corporación.

## II

### —A—

#### LA LEGISLACIÓN

La cuestión medular envuelta en este recurso es si alguna de las disposiciones del "dealer's retail agreement" a que hemos venido haciendo referencia, o las relaciones entre Financial Credit Corporation y Soler & Mascaró Auto Corporation, infringen las disposiciones locales vigentes para la fijación del interés en las obligaciones. Los preceptos de ley aplicables contenidos en el Código Civil de Puerto Rico (ed. 1930) son los siguientes:

Artículo 1649 (31 L.P.R.A. sec. 4591):

"A falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato, o con ocasión de un fallo o sentencia que no se haya cumplido, será de seis (6) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto; *Disponiéndose, sin embargo,* que no podrá fijarse un tipo de interés, por convenio especial, que sea mayor de nueve (9) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, cuando el capital objeto del préstamo o del convenio no exceda de $3,000, y de ocho (8) dólares anuales por cada cien (100) dólares, cuando pase dicha cantidad. Dentro de los límites que por este título se fijan, será legal descontar letras y pagarés y otras obligaciones análogas."

Artículo 1652 (31 L.P.R.A. sec. 4594):

"Excepto como queda autorizado por la sección anterior, ninguna persona podrá exigir o recibir directa o indirectamente, dinero o mercancías, a un tipo de interés mayor por el préstamo o prórroga del préstamo de algún dinero, que el tipo fijado por este capítulo. Nada de lo contenido en este capítulo se interpretará en el sentido de prohibir la venta de efectos al contado a un precio más bajo que al crédito.

"Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por este capítulo, podrá hacerse efectivo en una corte de Puerto Rico, sino por el importe del capital adeudado; y la corte deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenta y cinco por ciento de dicho capital y que el veinticinco por ciento restante sea adjudicado y recobrado por el Estado Libre Asociado de Puerto Rico, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a éste, para hacer efectivo el veinticinco por ciento así adjudicado."

Las disposiciones sobre fijación de interés en toda clase de obligaciones no fueron incorporadas en el Código Civil de

1902.(¹) Figuraban en una ley especial aprobada en 1 de marzo de 1902. (Estatutos Revisados, 1902, secs. 359 a 368, págs. 176–178.(²) Antes de ser trasplantada al Código Civil de 1930 esta ley fue enmendada en tres ocasiones: 1—mediante la Ley de 12 de marzo de 1903 (Leyes, pág. 111) se

(¹) En España, el Código Civil guarda silencio sobre esta materia, que está regulada por una ley de 23 de julio de 1908 (Medina y Marañón, *Leyes Civiles de España*, ed. 1958, tomo II, págs. 867–873) cuya característica esencial es que no se fija expresamente un tipo máximo de interés, sino que se deja al arbitrio y discreción del juez la determinación del carácter usurario del contrato de préstamo cuando el interés estipulado supera *notablemente* al normal del dinero y es manifiestamente desproporcionado con las circunstancias del caso. Por regla general este interés normal es de ocho por ciento, Sentencias de 13 de febrero de 1947 (17 Jurisp. Civil 623, 632) y 13 de julio de 1942 (Aranzadi, *Repertorio de Jurisprudencia*, tomo IX (1942), pág. 537). Las circunstancias a que se refiere la ley son la situación angustiosa o agobiante del deudor, (cf. *General Motors Acceptance Corp.* v. *Weinrich*, 262 S.W. 425 (Mo. 1924), su inexperiencia o la limitación de sus facultades mentales. Se ha indicado que esta ley procura "en atención al fin social, ético y moral que la inspira, la protección de aquéllos que asumen las obligaciones estando necesitados", y que la concurrencia de estas circunstancias produce la nulidad porque su presencia implica "una disminución de la libertad" contractual, Sentencia de 15 de marzo de 1956, 55 Jurisp. Civil (III) pág. 557. Véase R. Morán, *Aplicación de la Ley de Usura a los Préstamos Pagaderos a Plazos*, Revista Jurídica de la Universidad de Puerto Rico, vol. XXIX, pág. 242 (1960).

Igual solución a la de España prevalece en cuanto al interés en los contratos de préstamo o mutuo en Méjico (arts. 2393 a 2397 del Código Civil), Colombia (artículo 2231 del Código Civil) y Panamá (artículo 1450 del Código Civil).

Con excepción de Maine, Massachusetts y Nueva Hampshire, existen leyes en todos los estados limitando o regulando el tipo de interés. Para un resumen de la legislación sobre fijación de interés en los distintos estados de la Unión, véase Horack, *A Survey of the General Usury Laws*, 8 Law & Contemp. Probl. 36, 48–53 (1941). Aclaramos que en algunos estados las disposiciones a que se hace referencia en dicho artículo han sufrido notables cambios precisamente para ajustarlas al problema de las ventas a plazos y su financiamiento. Véanse, Md. Ann. Code. art. 83 § 132 (1957); New York Personal Property Law, §§ 304, 404.

En cuanto a la fijación de interés por bancos nacionales la ley aplicable aparece en 48 Stat. 191 (1935), 12 U.S.C.A. § 85.

(²) Las secciones 1 y 4 de esta ley, correspondientes a los artículos 1649 y 1652 transcritos, leían como sigue:

"SECCIÓN 1.—(359)—A falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato, o con ocasión de un fallo o sen-

reduj de doce a seis el tipo del interés legal, y se incluyó una disposición al efecto de que "dentro de los límites que por esta ley se fijan, será legal descontar letras y pagarés y otras obligaciones análogas" (sec. 1) ; 2—la Ley de 14 de marzo de 1907 (Leyes, pág. 229) (a) limitó la aplicación de las disposiciones sobre fijación de interés a operaciones de préstamo y eliminó la referencia que se hacía a "comisión o descuento"; y, (b) restringió la nulidad del contrato en que se reservara, aceptara o asegurara un tipo mayor que el interés permitido por la ley al pacto de intereses, sin que dicha nulidad alcanzara al pago de la suma principal; y, 3—por la Ley Núm. 47 de 13 de abril de 1916 (Leyes, pág. 103) (a) se incluyó un párrafo que dispone que "(n)ada de lo contenido en esta ley se interpretará en el sentido de prohibir la venta de efectos al contado a un precio más bajo que al crédito"; y (b) se dispuso que en el caso de una transacción en violación de la ley, el acreedor sólo podrá recobrar del deudor el setenta y cinco por ciento del capital adeudado y que el veinte y cinco por ciento restante se adjudicaría —como penalidad—al Estado.

Es significativo que en la misma fecha en que se aprobó la enmienda de 1916 que hace referencia a la venta de efectos al contado a un precio más bajo que a crédito, se enactó la

tencia no cumplido, será de doce ($12) dollars anuales sobre cada cien ($100) dollars o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto. *Disponiéndose,* sin embargo, que no podrá fijarse un tipo de interés por convenio especial que exceda de doce ($12) dollars anuales sobre cada cien ($100) dollars o sobre su equivalente en valor."

"SECCIÓN 4 (362)—Excepto como queda autorizado por la Sección tercera de esta ley, ninguna persona podrá exigir o recibir, directa o indirectamente, dinero o mercancías, ni por comisión o descuento, o ni otra forma cualquiera, un tipo de interés mayor por el préstamo o la prórroga de algn dinero, que el tipo fijado por la presente.

"Cualquier contrato en el cual directa o indirectamente se reserve, acepte, o asegure o se comprometa a reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por esta ley, es completamente nulo; y el tribunal competente, en un juicio adecuado, podrá suspender el cobro de dicho interés o cualquier procedimiento para hacer cumplir el contrato."

legislación sobre ventas condicionales, Ley Núm. 61 de 13 de abril de 1916 (Leyes, pág. 126, 10 L.P.R.A. secs. 31 a 41). Esta actuación legislativa constituye, cuando menos, un reconocimiento de la realidad económica de que necesariamente tiene y debe existir una diferencia entre el precio de una venta al contado y una venta a plazos.[3] Hace seis años "ante el clamor de un sector numeroso del pueblo de Puerto Rico en cuanto a que en los negocios de ventas a plazos mediante el sistema de ventas condicionales y de hipoteca de bienes muebles, se estaba cobrando precios excesivos",[4] y a los fines de conjurar los males capitales que indicó existían, a saber, 1—los altos márgenes de beneficios que se percibían en estas transacciones; 2—las prácticas abusivas en las operaciones de financiamiento, y 3—el abuso en el otorgamiento de contratos sin garantías para el consumidor, la Asamblea Legislativa aprobó una enmienda a la sección 2 de la Ley de Ventas Condicionales (Ley Núm. 13 de 12 de abril de 1955 Leyes, pág. 51, 10 L.P.R.A., sec. 32), para, "en forma simultánea mediante la Oficina de Estabilización Económica regulando y manteniendo un control de los márgenes de beneficio", extirpar dichos males regulando la forma de llenarse los contratos, prohibiendo la firma de contratos en blanco y estableciendo que *se especifique el precio del artículo*. Idénticas disposiciones se aprobaron en relación con la hipoteca de bienes muebles. (Ley Núm. 57 de 10 de junio de 1955, pág. 207, 30 L.P.R.A. secs. 1873 y 1875.) Y, aún más recientemente, mediante la Resolución de la Cámara de Repre-

---

[3] El Reglamento de Precios núm. 5 fijando precios para telerreceptores, reparaciones y antenas promulgado por el Administrador de Estabilización Económica, efectivo en 1 de julio de 1954, y que fuera suspendido mediante orden de 8 de agosto de 1958, efectiva en 11 del mismo mes (23 R. & R.P.R. 734–451) establecía en su sección 3(e) que el precio máximo a plazos era el mismo que para ventas de contado, pero reconocía que en las ventas a plazos se podría cargar determinada cantidad adicional sobre el balance adeudado para "el pago de *intereses, gastos de cobro y financiamiento*", siempre que esta cantidad no excediera de un diez por ciento de dicho balance.

[4] Diario de Sesiones (1954), pág. 1844.

sentantes Núm. 13 de 24 de enero de 1961 se autorizó la realización de un estudio del sistema de ventas condicionales. El informe correspondiente fue rendido en 2 de mayo pasado. Se encuentra pendiente de consideración ante los cuerpos legislativos el Proyecto de la Cámara 93, presentado por los Representantes Alvarado, Font Saldaña, Polanco Abréu y Cordero, mediante el cual se intenta regular los negocios de financiamiento de contratos de ventas condicionales de bienes muebles. Dicha medida requiere que cualquier persona o entidad que se dedique a este negocio a) se proveerá de una licencia que expedirá el Secretario de Hacienda (art. 4); b) deberá archivar la escala o escalas de descuento vigentes en sus operaciones de financiamiento en uso corriente (art. 9). Se autoriza, además, al Secretario de Hacienda a fijar, mediante reglamentos aprobados por el Gobernador, la escala o escalas de descuento para todo concesionario de licencia dedicado a operaciones de financiamiento de ventas condicionales; y, a establecer los términos y condiciones que deberán contener dichos contratos.

—B—

## La Interpretación de los Tribunales

La humanidad ha estado preocupada con el problema de la usura desde los tiempos bíblicos. El Pentateuco está salpicado de referencias a la usura. Y en Exodo, entre las leyes sociales que Yahvé dio a Moisés, se indica que "Si prestas dinero a uno de mi pueblo, al pobre que habita contigo, no serás con él como usurero; no le exigirás interés" (Exodo 22:25). Sin embargo, andando el tiempo este rigor que al pacto sobre interés impusiera la religión—considerándolo como pecado—y el derecho canónico—declarándolo ilegal—se fue atemperando y se aceptó un nuevo concepto, el del interés razonable. El advenimiento de la Revolución Industrial, y la consiguiente necesidad de capital para el desarrollo industrial y técnico generaliza la adopción de estatutos fijando el tipo de interés en las obligaciones. Con la producción en serie

desde principios de siglo, y la consiguiente distribución en masa de los productos, surge la venta a crédito y a plazos para canalizar hacia el consumidor esta producción. Por otro lado, sin este sistema de distribución, el precio sería aún mayor. A estos factores puede unirse la presión ingeniosa de las agencias de publicidad y la competencia entre los traficantes. Hacen su aparición en el panorama económico las compañías de financiamiento, como un instrumento indispensable para poner el artículo al alcance del consumidor promedio que no puede pagar el precio de contado y para permitir que el productor emplee su capital exclusivamente en la empresa industrial. Y se plantea entonces la aplicación de las leyes de usura a las ventas a crédito. (5)

La interpretación inicial que rige en la mayoría de los estados, conocida como la doctrina tradicional, sostiene que los estatutos sobre usura no son aplicables a las ventas a crédito. Varios fundamentos se han adelantado para ello El histórico, que señala que, como estas leyes se aprobaron antes del fenómeno económico que constituyen las ventas a crédito, especialmente artículos de consumo, el legislador no puede haber intentado cubrirlas bajo sus disposiciones; (6) el exegético, que rechaza la aplicación mediante la distinción entre un préstamo propiamente dicho y la transacción de venta a plazos acompañada del financiamiento de la obligación, que asume el consumidor; (7) el filosófico, que se basa en el

---

(5) *Usury in Installment Selling*, 9 Ala. L. Rev. 319 (1957); Isaacs, *Installment Selling: The Relation Between its Development in Modern Business and the Law*, 2 Law & Contemp. Probl., 141 (1935); Berger, *Usury in Installment Sales*, 2 Law & Contemp. Probl., 148 (1935); Encyclopaedia of the Social Sciences, ed. 1944, vol. XV, pág. 193.

(6) *Hogg* v. *Ruffner*, 1 Black 115 (1861); *In re Bibbey*, 9 F.2d 944 (Minn. 1925); *Bell* v. *Idaho Finance Co.*, 255 P.2d 715 (Idaho 1953); *District of Columbia* v. *Hamilton National Bank*, 76 A.2d 60 (D. C. 1950).

(7) *General Motors Acceptance Corp.* v. *Weinrich*, 262 S.W. 424 (Mo. 1924); *Commercial Credit Co.* v. *Tarwater*, 110 So. 39 (Ala. 1926); *General Motors Acceptance Corp.* v. *Swain*, 176 So. 636 (La. 1937); *Black* v. *Contact Purchase Corp.*, 42 N.W.2d 768 (Mich. 1950); *Underwriters Acceptance Corp.* v. *Dunkin*, 41 N.W.2d 855 (Neb. 1950); *Nelson* v. *Scarrit Motors*, 48 So.2d 168 (Fla. 1950); *Langille* v. *Central-Penn Nat. Bank of*

principio de que estos estatutos son limitativos de la libertad
de contratación, y, por tanto, no deben extenderse más allá
de sus términos claros y precisos. ([8]) También se ha dicho que
las disposiciones sobre fijación de interés responden al deseo
de proteger al prestatario necesitado, que no tiene más alter-
nativa ante su desamparo y urgencia que aceptar las con-
diciones que le imponga el prestamista, mientras que el con-
sumidor comprador está en libertad de adquirir o no la mer-
cancía, dependiendo de si le son aceptables las condiciones
de la transacción; ([9]) que el vendedor puede fijar un precio
mayor en las ventas a crédito considerando que asume un
mayor riesgo; que en las ventas a plazos se incurre en gastos
adicionales, tales como investigación de crédito, registro de
contratos en oficinas públicas, gastos de contabilidad y ges-
tiones de cobro, y otros, ([10]) que impedirían un margen razo-
nable de ganancia si se consideraran como un préstamo
directo.

---

*Philadelphia*, 153 A.2d 211, 213 (Del. 1959); *Wyatt* v. *Commercial Credit Corporation*, 341 S.W.2d 348 (Mo. 1960); Anno., *Usury as predicable upon transactions in form of sale or exchange of commercial paper or other choses in action*, 165 A.L.R. 626 (1946); Nota, *Finance Charges or Time Price Differential in Installment Sales—Usury?*, 24 Mo. L. Rev. 225, 228–231 (1959); cf. Sentencia del Tribunal Supremo de España de 27 de enero de 1915 (Jurisp. Civil, tomo 132, pág. 182), en la cual se dice que la ley sobre fijación de interés en las obligaciones no se extiende "a los con- tratos claramente definidos en el Código de carácter y finalidad diversa a los de préstamo, aunque en ellos se pacten entregas periódicas de sumas en efectivo, si son el precio o el cambio de prestación de servicios o de la entrega y transmisión de bienes muebles o inmuebles".

([8]) Fischer, *The Installment Contract and the Usury Laws-A Plea for a More Realistic Judicial Approach*, 18 U. of Pitt. L. Rev. 649 (1957).

([9]) *Hellman's* v. *Em'n Al's*, 77 N.W.2d 96 (Mich. 1956); *Luchesi* v. *Capitol Loan & Finance Co.*, 113 A.2d 725 (R.I., 1955); *Nazarian* v. *Lincoln Finance Corp.*, 78 A.2d 7 (R.I., 1951); *Lansdowne Finance Co.* v. *Prusky*, 182 A. 794 (Pa. 1936); Nota, *Are Installment Plans Usurious?*, 36 Minn. L. Rev. 744 (1952); Nota, 48 Yale L. J. 1102 (1939).

([10]) *Van Asperen* v. *Darling Olds, Inc.*, 93 N.W.2d 690, 695 (Minn. 1958); *Certified Motors, Inc.* v. *Nolan Loan Company*, 122 A.2d 227, 229 (DC 1956); *General Contract Purchase Corp.* v. *Propst*, 239 S.W.2d 563 (Mo. 1951); *Commercial Credit Co.* v. *Tarwater*, 110 So. 39 (Ala. 1926); Adelson, *The Mechanics of the Installment Credit Sale*, 2 Law & Contemp. Probl. 218 (1935).

Esta interpretación alentó la organización de las compañías de financiamiento, tanto en Estados Unidos como localmente. Como cuestión de hecho, las compañías del país siguieron las normas y prácticas de las americanas, adoptaron su sistema de operación, y hasta las formas de contratos, confiando en que ya habían recibido la sanción de los tribunales. Sin embargo, los excesos en los llamados "cargos" de financiamiento y la situación de invalidez en que se encontraba colocado el consumidor, produjeron una reacción en el pensamiento judicial que ha emprendido la misión de escudriñar las distintas transacciones en el ánimo de desentrañar su verdadera sustancia e intención, descartando la forma exterior, para proteger al comprador.[11] De ahí que la doctrina haya evolucionado en la consideración de la aplicación de los estatutos de usura a las ventas a plazo con un criterio más amplio y guiado por el concepto de que la interpretación tiene que responder a la realidad económica actual.[12] Así vemos cómo recientemente se ha iniciado una corriente, llamada la doctrina moderna, que, cuando menos, condiciona la interpretación original. Estas decisiones se basan en la similaridad en cuanto a su efecto económico de un préstamo personal cuyo producto se utiliza para comprar artículos de consumo y una venta a plazos seguida de una cesión por el vendedor a una compañía de financiamiento de las obligaciones asumidas por el consumidor comprador. En un esfuerzo por reconciliar la aplicación de las leyes de usura con el principio de que el vendedor puede disponer de su mercancía al precio que desee o estime conveniente, se han ela-

---

[11] *Commonwealth Company* v. *Fauver,* 101 N.W.2d 150 (Neb. 1960); *Ready Mix Concrete & Concrete Products Co.* v. *Perry,* 123 So.2d 241 (Miss. 1960); *Van Asperen* v. *Darling Olds, Inc.,* 93 N.W.2d 690 (Minn. 1958); *State* v. *Associates Discount Corporation,* 77 N.W.2d 215, 230 (Neb. 1956); *State* v. *Associates Discount Corporation,* 96 N.W.2d 55 (Neb. 1959); *Nazarian* v. *Lincoln Finance Corp.,* 78 A.2d 7 (R.I. 1951).

[12] Raffel, *Conditional Sales Contracts and Usury Laws,* 76 Bank L. J. 829 (1959); Nota, *Finance Charges or Time Price Differential in Installment Sales—Usury?,* 24 Mo. L. Rev. 225, 231-7 (1959).

borado las doctrinas del "precio aplazado de buena fe" (bona fide time price doctrine), que descansa en la oportunidad que se le tiene que brindar al comprador para que seleccione entre el precio de contado y el precio a plazos, ([13]) y la "certeza razonable" (*reasonable assurance*), que no se funda precisamente en el hecho de que el consumidor conozca efectivamente tanto el precio de contado como a plazos, sino en la participación directa de la agencia de financiamiento en el contrato de venta y especialmente por los actos de suministrar las formas de los contratos y las tarifas de pagos (*time price schedules*), la frecuencia de la cesión de contratos, y en general, una conducta que revela un entendido entre el traficante y la compañía, así como la relación—desde el punto de vista de control corporativo—entre el traficante y la entidad de financiamiento. ([14])

■ Es conveniente consignar que aun en aquellas jurisdicciones en las cuales se ha enunciado la regla de minoría,

---

([13]) *Commonwealth Company* v. *Fauver*, 101 N.W.2d 150 (Neb. 1960); *Robb* v. *Central Credit Corporation*, 100 N.W.2d 57 (Neb. 1959); *Thompson* v. *Commercial Credit Equipment Corp.*, 99 N.W.2d 761 (Neb. 1959); *Curtis* v. *Securities Acceptance Corporation*, 91 N.W.2d 19 (Neb. 1958); *McNish* v. *General Credit Corporation*, 83 N.W.2d 1 (Neb. 1957); *McNish* v. *General Credit Corporation*, 83 N.W.2d 13 (Neb. 1957); *Sloan* v. *Sears, Roebuck and Co.*, 308 S.W.2d 802 (Ark. 1957); *Hare* v. *General Contract Purchase Corp.*, 249 S.W.2d 973 (Ark. 1952); *G. F. C. Corporation* v. *Williams*, 231 S.W.2d 565 (Texas 1950); *Daniel* v. *First National Bank*, 228 F.2d 803 (CA 5, 1956); *Siebold* v. *Eastermann*, 13 N.W.2d 739 (Minn. 1944); Nota, *Judicial and Legislative Treatment of "Usurious" Credit Sales*, 71 Harv. L. Rev. 1143 (1958); Nota, *Application of Usury Statutes to Credit Sales*, 57 Mich. L. Rev. 298 (1958).

([14]) *State* v. *Associates Discount Corporation*, 96 N.W.2d 55 (Neb. 1959); *Crisco* v. *Murdock Acceptance Corp.*, 258 S.W.2d 551 (Ark. 1953); *Hare* v. *General Contract Purchase Corp.*, 249 S.W.2d 973 (Ark. 1952); *Associates Investment Co.* v. *Sosa*, 241 S.W.2d 730 (Texas 1951); *Associates Investment Co.* v. *Thomas*, 210 S.W.2d 413 (Texas 1948); Nota, *Transfer of Installment Contract to Finance Company as Evidence of Loan Transaction*, 37 Minn. L. Rev. 223 (1953); Nota, *Usury Statutes: Their Applicability to Credit Sale Followed by an Assignment to a Lending Agency*, 43 Idaho L. Rev. 87 (1957); cf. *Battle* v. *Patsy Auto Sales*, 99 N.E.2d 812 (Ohio 1951); *Curtis* v. *Securities Acceptance Corporation*, 91 N.W.2d 19, 26 (Neb. 1958); *Nelson* v. *General Credit Corporation*, 90 N.W.2d 799 (Neb. 1958).

los efectos de las decisiones han sido con carácter prospectivo, y en ningún caso se han extendido a contratos otorgados o relaciones creadas con anterioridad a la nueva norma.[15] Esta actitud de mesura tiende a evitar dislocaciones violentas en un sistema económico que se ha estructurado confiando en un estado de la jurisprudencia que consagraba la inaplicabilidad de las disposiciones sobre usura a las ventas a plazo.

Aparentemente parte de la reticencia de los tribunales a intervenir más activamente en el problema que discutimos está enraizada en el criterio de que la situación demanda más bien acción legislativa. A los fines de proteger a los consumidores de los gastos exorbitantes de financiamiento se han adoptado varias medidas que tienden a reglamentar la extensión de crédito, a la vez que se conserva un margen razonable de beneficio para estimular la economía: 1—se requiera que las compañías de financiamiento obtengan una licencia; [16] 2—se dispone que los términos de la venta se especifiquen claramente y se entregue una copia del contrato al deudor, quien debe reconocer por escrito haber recibido la misma; y además, se requiere, bajo pena de nulidad, que el contrato se complete antes de que se proceda a su firma, evitando así el otorgamiento de contratos en blanco; [17] 3—fijación por

---

[15] *Great Northern Ry.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358 (1932); *Hare* v. *General Contract Purchase Corp.,* 249 S.W.2d 973 (Ark. 1952); *County of Los Angeles* v. *Faus,* 312 P.2d 680 (Cal. 1957), en donde se indicó que no existe reparo constitucional alguno para que un tribunal de última instancia al anunciar una norma doctrinaria seleccione si la misma ha de tener efecto retroactivo, como es la regla general, o únicamente prospectivo, dependiendo tal determinación de los méritos en justicia (equities) de cada caso; *Arizona State Tax Comission* v. *Ensign et al.,* 257 P.2d 393 (Ariz. 1953); *Parker* v. *Port Huron Hospital,* 105 N.W.2d 1 (Mich. 1960); *Phillips Exeter Academy* v. *Gleason,* 157 A.2d 769 (N.H. 1959); Notas, 28 Ill. L. Rev. 277 (1933); 17 Minn. L. Rev. 811 (1933); 11 N. C. L. Rev. 323 (1933).

[16] Véase P. de la C. 93, pendiente de consideración ante la Asamblea Legislativa.

[17] La Ley Núm. 13 de 12 de abril de 1955 (Leyes, pág. 51) que enmendó el artículo 2 de la Ley de Ventas Condicionales, Núm. 61 de 12 de abril de 1916 (Leyes, pág. 126, 10 L.P.R.A. sec. 32) dispone, entre otras cosas, que "todo contrato de venta condicional se otorgará por escrito y no

estatuto de un límite máximo para los gastos de financiamiento, bien estableciendo un por ciento fijo o una escala que depende de la clasificación de la cosa objeto del contrato, los riesgos envueltos en la transacción y otros factores; y, en algunos casos, se requiere que las compañías de financiamiento presenten a determinada agencia gubernamental una relación de las diferentes partidas que se incluyen en los "gastos de financiamiento";([18]) 4—se requiere que en los casos de pago anticipado por el consumidor se le reembolse la cantidad proporcional de los gastos de financiamiento no devengados (*unearned finance charges*); 5—se elimina la participación del vendedor que en forma de bonificación se le concede por la compañía de financiamiento (*dealer's bonus*);([19]) y, 6—se limita la cantidad que por concepto de gastos legales puede cobrarse en caso de ejecución. En general, sobre este particular, véanse, Nota, *Are Installment Plans Usurious?*, 36 Minn. L. Rev. 744, 753–756 (1952); *Consumer Credit Symposium; Developments in the Law*, 55 Nw. U.L. Rev. 301–418 (1960); *Nebraska Usury Statutes, The Time Price Scale Transaction and the Installment Sales Act*, 40 Neb. L. Rev. 433–465 (1961). Un resumen de la legislación vigente en varios estados para reglamentar las

---

será firmado sino después que contenga todo lo convenido por las partes" y que "en todo contrato se establecerá el precio de la cosa objeto del contrato, la cantidad pagada inicialmente, el balance adeudado incluyendo *separadamente* cualquier suma pagada por seguro y los riesgos cubiertos por la póliza; gastos de financiamiento y por cualquier otro concepto, los cargos a cobrarse en caso de mora y el monto o número de los plazos a pagar, así como el recargo en términos de por ciento anual sobre el precio de la cosa al contado que resulte de la suma de todos los cargos anteriormente señalados, con excepción del de mora" (véase, *Millán* v. *Caribe Motors Corp.*, 83 D.P.R. 494 (1961). (Bastardillas nuestras.)

([18]) Véase, P. de la C. 93, supra.

([19]) En aquellos estados en que se permite la participación del traficante en los cargos de financiamiento se requiere que, cuando menos, preste algún servicio a cambio de ello, como obtener la información sobre el crédito del comprador o suplir las formas del contrato, etc.

ventas a crédito aparece en 9 Ala. L. Rev. 336–7, y sobre los préstamos de cantidades pequeñas en 8 Law & Contemp. Probl. 134–145 (1941).

—C—

### El Presente Caso

En *International General Electric* v. *Buscaglia*, 66 D.P.R. 258 (1946) dijimos, a la página 272, que "Suponemos, sin decidirlo, que si se presenta la cuestión en un caso apropiado, . . . resolveríamos que tales cargos de 'finanzas' cuando se hacen en relación con una venta condicional, no son usurarios porque forman parte del precio de venta, y no son intereses." Como podrá apreciarse inmediatamente lo transcrito era innecesario a los fines de resolver el pleito que se consideraba, y fue enunciado en 1946 cuando aún el problema de los cargos excesivos de financiamiento no se había agudizado en la forma alarmante de la última década. Por otro lado, para dicha fecha la jurisprudencia era casi unánime respecto a la inaplicabilidad de las disposiciones sobre usura a las ventas a crédito. Estas normas judiciales respondían a la reserva prevaleciente respecto a toda reglamentación de los negocios y a un concepto absoluto de laissez-faire en cuanto a la iniciativa privada. Actualmente no se discute seriamente la facultad del gobierno para reglamentar los negocios para protección del público en general, y en particular, de los consumidores. Es por eso que la parte transcrita de la opinión del caso de *International General Electric* no tiene mayor alcance que el de un comentario anticipado sobre un problema que no estaba planteado ni era necesario resolver entonces.

No puede ignorarse que la mecánica de la venta a plazos y la cesión del contrato a la entidad financiadora en realidad engendra una relación tripartita: el traficante suple la mercancía, la compañía concede el financiamiento, y el consumidor paga, tanto por la mercancía como por el financiamiento. Es obvio que existe una relación entre el consumidor y la entidad de financiamiento cuando concurren ciertas circuns-

tancias a las cuales aludiremos inmediatamente. *Limiting Consumer Credit Charges by Reinterpretation of General Usury Laws and by Separate Regulation*, 55 Nw. U.L. Rev. 303 (1960).

 Después de considerar serenamente las distintas interpretaciones sobre este espinoso asunto, y sobre todo el impacto probable en la economía puertorriqueña, adoptamos como norma *prospectiva* en esta jurisdicción la de que transacciones como las del presente caso—venta a crédito seguida del financiamiento de la obligación del comprador—pueden estar sujetas a las disposiciones que fijan el interés en las obligaciones, o sea, a ser declaradas usurarias. *Todo depende de las circunstancias de cada caso en particular.* Cuando no se trate de una transacción fidedigna en la cual el vendedor meramente aumenta el precio para compensarse por el riesgo y los gastos mayores de una venta a crédito, sino de un mero subterfugio para encubrir el cobro de un tipo de interés superior al permitido por la ley, aplicaremos sin vacilación las disposiciones sobre usura. Si el vendedor ha aumentado el precio en la venta a crédito con la razonable certeza de que la obligación del comprador le será descontada o negociada por la entidad de financiamiento, la transacción se considerará en realidad como un préstamo, y podrá ser atacada como teñida por la usura. El suministro por la entidad de financiamiento de las formas de contrato y las tarifas de pago para determinar los aumentos que se harán al precio de contado a los fines de fijar finalmente el precio a crédito son circunstancias indicativas de la existencia de esta razonable certeza, así como la frecuencia de las transacciones entre el traficante y la compañía de financiamiento y el patrón uniforme de los negocios entre ambas, especialmente cuando el vendedor gestiona el financiamiento de la obligación aplazada del comprador. Con excepción de un cargo razonable por los gastos adicionales que implica el financiamiento, y que en este caso en particular se fijó en un dos por ciento, y del pago de las pri-

mas de seguro (*Griffin* v. *Murdock Acceptance Corporation*, 303 S.W.2d 242 (Ark. 1957)), cualquier cantidad adicional que computada por una anualidad exceda del tipo de interés máximo señalado por la ley convertiría la transacción en usuraria. La práctica de cobrar al consumidor una determinada cantidad que se le acredite al traficante como un bono (*dealer's bonus*) constituye la exacción de un interés adicional, práctica que reprobamos. Y sobre toda otra consideración, el procedimiento de cobrar inicialmente el tipo de interés máximo, o sea, nueve por ciento anual sobre la totalidad del precio aplazado (*flat rate*), principal que luego va disminuyendo mediante los pagos periódicos—generalmente mensuales—en efecto constituye el pago de intereses usurarios, pues se están pagando réditos sobre una cantidad de la cual no se ha disfrutado totalmente durante la duración del contrato, *Harrell* v. *Colonial Finance Corporation*, 341 S.W.2d 545 (Texas 1960); *Hillman's* v. *Em'n Al's*, 77 N.W.2d 96 (Mich. 1956); *Bird Finance Corporation* v. *Lamerson*, 6 N.W.2d 732, 737 (Mich. 1942); Anotación, *Usury Interest in Advance*, 57 A.L.R.2d 630, 663-668 (1958). El interés debe por tanto computarse tomando en cuenta los pagos periódicos, aun cuando se cobre inicialmente. Reconocemos que existe la posibilidad de que esta interpretación afecte las ventas a crédito, pero no podemos cerrar nuestros ojos a una situación local que requiere un pronto remedio. La acción corresponde a la Legislatura para aprobar legislación regulatoria de la extensión de crédito al consumidor, como la medida actualmente bajo consideración. De todas formas, todo cuanto resolvemos es que la cesión del contrato de venta condicional y la hipoteca de bienes muebles para garantizar un precio aplazado no está inmune de ser impugnada por el consumidor por estar manchada de usura. Repetimos que todo dependerá de las circunstancias particulares de cada caso.

En vista de que la norma que hemos adoptado es con carácter prospectivo únicamente, ([20]) y no se aplica a contratos otorgados o relaciones creadas con anterioridad a esta fecha, procedería la confirmación de la sentencia dictada por el tribunal de instancia. Pero aún si ese no fuere el caso, igual solución se impondría por los motivos adicionales que expondremos seguidamente. Según acertadamente expone el juez recurrido en sus conclusiones de derecho, la parte demandante no puede levantar el carácter usurario de los contratos aquí envueltos:

"Volviendo a las transacciones envueltas, para que interviniera la demandada, tenía que haber ocurrido antes una operación de compraventa entre Soler & Mascaró y un tercero. No podía haber lo primero sin lo segundo. Pero a pesar de que el demandante imputa usura, está conteste con, y no discrepa del criterio del Tribunal en cuanto a que el cargo de $233.06 que Soler & Mascaró hizo al comprador del vehículo no constituye usura, ni interés cobrado en violación de la ley. Para el demandante la usura comienza cuando Soler & Mascaró traspasó a la demandada el contrato condicional conteniendo el mismo precio fijado para la venta a crédito.

"Al llegar a este punto tenemos que afrontar otra defensa afirmativa de la demandada, en el sentido de que aún en el supuesto de haberse realizado operaciones de préstamo como alega el demandante y aún en el supuesto de que se hubiera cobrado intereses usurarios, el demandante no es la parte realmente interesada o con causa de acción, por cuanto tales intereses, de haberlos, fueron pagados a la demandada por los compradores de los vehículos y Soler & Mascaró no se perjudicó económicamente con el pago de los mismos aún cuando fueran en exceso.

---

([20]) Aunque no se trata del caso típico de revocación de una doctrina establecida anteriormente, no es menos cierto que se puede haber descansado en la expresión transcrita del caso de *International General Electric*. Además, seguramente se consideró la regla mayoritaria prevaleciente en Estados Unidos. No creemos que los méritos en justicia (equities) requieran la aplicación retrospectiva de la norma que hemos enunciado, ya que posiblemente ello causaría una grave dislocación en la economía.

"La prueba demostró que los compradores de vehículos satisficieron a la demandada los balances aplazados que incluían ya los cargos de financiamiento, en algo más de un 97% de los mismos, y en 92% de los casos. Pagaron la cantidad de $1,091,498.90 de la cantidad total de $1,135,293.88."

Como los intereses en exceso del margen legal fueron satisfechos por los compradores, el traficante o su síndico nada pueden recobrar por lo que se refiere a tales transacciones. En cuanto a aquellos contratos en que la demandada cargó los plazos a la corporación en quiebra por mor de su responsabilidad subsidiaria para el caso de mora de los compradores condicionales, la relación entre las partes se rige por los términos del *dealer's retail agreement*. A esta clase de contratos no podemos extenderle la protección de la doctrina enunciada, porque ésta responde principalmente a la obligación de proteger al consumidor necesitado de crédito. Además dicho contrato en lo que respecta a las relaciones del traficante y la entidad de financiamiento, no es más que una modalidad de la cesión de créditos, o sea, de una compraventa. Y según lo resolvió el tribunal de instancia, dicho acuerdo no respondió al deseo de encubrir una operación de préstamo, sino que contiene las obligaciones que ambos convinieron libremente y asumieron con plena conciencia de sus consecuencias legales. Cf. *Klett* v. *Security Acceptance Co.*, 242 P.2d 873 (Cal. 1952) ; *Cullum* v. *General Motors Acceptance Corp.*, 68 F.2d 210 (CCA 5, 1933) ; *General Motors Acceptance Corp.* v. *Mid-West Chevrolet Co.*, 66 F.2d 1 (CCA 10, 1933) ; *Wealcott* v. *Skilton*, 94 A.2d 793 (Conn. 1953). Nota, *Protection of Borrowers in Distribution Finance*, 60 Yale L. J. 1218 (1951).

No obstante, insiste la parte apelante que, en su condición de síndico de la corporación en quiebra, puede ejercitar la causa de acción que corresponde a los compradores de vehículos de motor, ya que *representa* a los acreedores. No se requiere gran elaboración para disponer de esta alegación.

Las disposiciones de la Ley de Quiebras a que hace referencia meramente establecen que el síndico queda investido con todos los derechos y causas de acción que correspondan al quebrado, y, en defensa de los acreedores, puede instar todas las acciones cuyo efecto sea el de acrecentar el activo sujeto a distribución entre éstos, o sea, que debe realizar todas aquellas gestiones que aumenten el patrimonio de la entidad en quiebra, como por ejemplo, acciones para dejar sin efecto traspasos fraudulentos verificados con anterioridad a la quiebra, o actos y contratos que constituyan preferencias a otros acreedores. *In re Jacoby*, 138 F.2d 42 (CCA 3, 1943) ; Sección 70 de la Ley de Quiebras, 11 U.S.C. §110, Collier, *On Bankruptcy*, 14a ed., vol. 4, págs. 926–929, 1238–1281. Pero ni remotamente puede sostenerse haciendo el mayor esfuerzo de la imaginación, que el síndico pueda abrogarse la representación de los acreedores para llevar a cabo gestiones conducentes a la reivindicación de elementos que forman parte del activo patrimonial particular de los acreedores. Como hemos expuesto anteriormente, cualquier causa de acción por la exacción de intereses usurarios sólo puede corresponder a la persona que efectivamente hizo los pagos, en este caso, a los compradores de vehículos, cuyos patrimonios fueron los únicos en sufrir deterioro y perjuicio con motivo de tales cobros.[21] Y bajo el cuadro de hechos que admirablemente resumió el juez de instancia, mal podría Soler & Mascaró Auto Corporation, a través de su síndico, hacer reclamación alguna, ya que, cuando menos, fue instrumento eficaz para iniciar y permitir el cobro de estos intereses en exceso del margen legal. Cf. *Cámara Insular, etc.* v. *Anadón*, 83 D.P.R. 374 (1961).

La sección 70 (a) (6) de la Ley de Quiebras expresamente autoriza al síndico a iniciar las acciones que corresponden al quebrado que surjan de transacciones usurarias. Pero se refiere a transacciones en las cuales la entidad en

---

[21] En España se ha resuelto que la acción de nulidad concedida por la Ley de 23 de julio de 1908 compete únicamente al contratante perjudicado. (Sentencia de 23 de mayo de 1929, Jurisp. Civil, tomo 189, pág. 404.)

quiebra ha sido la parte afectada, ya que se considera que la exacción de intereses usurarios constituye un perjuicio (*injury*) al activo del quebrado, *Reed v. American-German National Bank*, 155 F. 233 (Ky. 1907) ; *Lasater v. First Nat. Bank*, 72 S.W. 1057 (Texas 1903) ; *Ripple v. Mortgage and Acceptance Corp.*, 137 S.E. 156 (N.C. 1927) ; cf. *Kelter v. American Bankers Finance Co.*, 160 A. 127 (Pa. 1932), y aún bajo esta disposición se le han negado al síndico determinadas defensas y remedios que se le reconocen personalmente al prestamista deudor bajo los estatutos estatales pertinentes. *Chraime v. Catton*, 183 N.Y.S.2d 874 (1959) ; *New York Credit Men's Ass'n v. Manufacturers Discount Corp.*, 60 N.Y.S.2d 2 (1945) ; Krause, *The Treatment of Usury in Bankruptcy Proceedings*, 29 N.Y.U. L. Rev. 1083 (1954). En *In re Alday Motor Co.*, 50 F.2d 228 (D.C. Tenn. 1930), el síndico del quebrado reclamó pagos de intereses excesivos, pero se sostuvo que como el récord demostraba "que este interés usurario fue de hecho pagado por los compradores (y no por el quebrado) y simplemente transferido por éste a uno de los peticionarios", el síndico estaba impedido de formular reclamación alguna.

—III—

Réstanos considerar la cuestión planteada por la parte apelante en cuanto se refiere a las causas de acción que el tribunal de instancia desestimó, sin perjuicio, por entender que el foro adecuado para intentar su resarcimiento es la Corte de Quiebras. Se trata de las reclamaciones por la cantidad de $80,000 que se cargó por la demandada contra la cuenta de reserva por gastos incurridos al proceder a reposeer y vender vehículos de motor sujetos a contratos de venta condicional que fueron cedidos a Financial Credit Corporation por Soler & Mascaró Auto Corporation, y por la suma de $5,217.74 que fue reintegrada a los compradores al dejar Soler & Mascaró de pagar a la corporación aseguradora las primas de seguro que les había cargado a dichos compradores.

Resalta inmediatamente que se trata de reclamaciones rela-
cionadas con un activo de la entidad en quiebra, o sea, la
reserva a favor del traficante creada en virtud de los térmi-
nos del *dealer's retail agreement,* sobre la cual el síndico
quedó investido con un título absoluto de propiedad. Las
actuaciones de la demandada a que se alude surgieron *después*
de presentarse la petición inicial de quiebra y como conse-
cuencia de la liquidación final de las relaciones contractuales
entre la demandada y Soler & Mascaró Auto Corporation,
representada por su síndico. Es preciso aclarar a este res-
pecto que el síndico no repudió en momento alguno el contrato
de referencia, sec. 70(b) de la Ley de Quiebras, 11 U.S.C.
sec. 110(b). Si se tratara de una causa de acción bajo los
incisos 5 y 6 de la sección 70(a) de la Ley de Quiebras, 11
U.S.C. §110, que pasó al síndico como parte del activo, el sín-
dico tendría que iniciarla en los tribunales de Puerto Rico a
menos que la parte demandada consintiera en someterse a
la jurisdicción federal, *Helbert* v. *Sullivan,* 123 F.2d 477
(CCA 1, 1941); *Charness* v. *Katz,* 48 F. Supp. 374 (Wis.
1943); Collier, *op. cit.,* vol. 4, pág. 1247. Ahora, cuando se
trata de reclamaciones surgidas con posterioridad a la radi-
cación de la petición de quiebra, los tribunales locales tienen
jurisdicción concurrente con las cortes de quiebra para enten-
der en las mismas, *French* v. *R. P. Smith & Sons Co.,* 84
N.W.44 (Minn. 1900); *Westall* v. *Avery,* 171 F. 626 (CCA
4, 1909); Collier, *op. cit.,* vol 2, pág. 600. Para iniciar tales
acciones no es indispensable obtener el consentimiento de la
corte de quiebras, *Boyle* v. *Lewiston Trust Co.* 136 A. 292
(Me. 1927); *Harlin* v. *American Trust Co.,* 119 N.E. 20
(Ind. 1918); Collier, *op. cit.,* vol. 1, págs. 158-159; vol. 2,
págs. 604 y 1744; cf. *Palmer* v. *Larchmont Mann. Co.,* 30
N.E.2d 599 (N.Y. 1940), aunque ésta es la mejor práctica,
*In re Meadows, Williams and Co.,* 181 F. 911 (N.Y. 1910);
cf., sobre la necesidad de autorización expresa cuando el
pleito está pendiente a la fecha de la radicación de la petición

de quiebra, *Hall* v. *Main*, 34 F.2d 528 (Ill. 1929). En general, sobre la facultad del síndico para iniciar y proseguir pleitos, véase, Collier, *op. cit.*, §47.05 vol. 2, págs. 1742–1745. Siendo ello así, debemos resolver sobre la procedencia de las dos causas de acción a que nos hemos referido.

■ En cuanto a las cantidades cargadas por gastos incurridos al proceder a reposeer y vender vehículos de motor sujetos a contratos de venta condicional que fueron cedidos a Financial Credit Corporation, es suficiente decir que esta actuación está expresamente provista y sancionada en el *dealer's retail agreement* que rige las relaciones entre las partes (párr. 4 *in fine*). Y respecto a las cantidades devueltas a los compradores de vehículos por primas de seguro que les cobró Soler & Mascaró Auto Corporation y retuvo indebidamente sin cubrir los riesgos correspondientes según aparecía de los contratos de venta condicional—sumas que habían sido entregadas para ese propósito específico por la demandada— baste decir que las mismas pueden considerarse como un "cargo por el reembolso de cualquier gasto incurrido por la Financial Credit Corporation con relación a dichos documentos" a que alude el párrafo 5(b) del mencionado acuerdo entre las partes.

■ Sobre los beneficios producidos por los fondos de las reservas no es necesario elaborar una extensa discusión para concluir que tampoco asiste la razón a la parte apelante. Se trata de meros asientos de contabilidad, sujetos a una liquidación final bajo los términos del contrato entre las partes, cuyo efecto fue configurar dichas reservas como una garantía adicional del cumplimiento por el traficante de las obligaciones asumidas. Proyectada por la imaginación en forma de espiral no es extraño que la reclamación exceda del importe mismo del fondo. Por otro lado, de ser procedente, no se probó adecuadamente—como incumbía al demandante—las supuestas ganancias derivadas por la parte demandada en la reinversión de estos dineros. *De la Fuente* v. *A. Roig Sucrs.*

82 D.P.R. 514, 534 (1961); *Sánchez* v. *Cooperativa Azucarera*, 66 D.P.R. 346, 353 (1946); *Boria* v. *The Maryland Casualty Co.*, 60 D.P.R. 830 (1942).

Finalmente, la imputación de pasión, prejuicio y parcialidad al juez de instancia no amerita discusión.

*Se confirmará la sentencia apelada dictada por el Tribunal Superior, Sala de San Juan, en 17 de septiembre de 1954.**

---

### APENDICE "A"
#### "Hechos Probados y Determinaciones de Hecho

"(1) El demandante Manuel Monclova es el Síndico de la Corporación en quiebra Soler & Mascaró Auto Corporation. El 12 de marzo de 1952 el Juez de Quiebras radicó en la quiebra de Soler & Mascaró un informe especial dirigido a la Corte de Distrito de Estados Unidos en Puerto Rico exponiendo que el Síndico había solicitado permiso para entablar demanda en representación de la quiebra contra Financial Credit Corporation, basada dicha demanda en cierto contrato entre Financial Credit y la corporación en quiebra el cual se alegaba que constituía un préstamo y no la compra de documentos negociables, y que por lo tanto, a la corporación en quiebra le habían sido cargados intereses de usura; que se alegaba también que Financial Credit Corporation al manejar los dineros de la corporación en quiebra sin autorización se había enriquecido injustamente; y que por la retención ilegal de dineros de la corporación en quiebra, Financial Credit había causado el colapso económico de aquélla. El informe continuaba exponiendo que el Síndico había solicitado el nombramiento de los abogados que representaban a Soler & Mascaró en los procedimientos de quiebra para que se unieran al abogado del Síndico en esta demanda, y se recomendaba favorablemente tal nombramiento. Por orden fechada 14 de marzo de 1952, la Corte de Distrito de Estados Unidos para Puerto Rico

---

*Nota del Editor: En la sentencia dictada en este caso se hace constar lo siguiente:

"El Juez Asociado señor Belaval hace constar que en caso de no haber sido la norma sentada en este caso de carácter prospectivo, no hubiera participado en la solución del mismo, pero siendo de carácter prospectivo, y de acuerdo con la regla de necesidad para constituir mayoría del Tribunal en pleno, participa en la decisión por estar totalmente de acuerdo con la misma."

autorizó el nombramiento de los referidos abogados de Soler & Mascaró para que representaran al Síndico de Soler & Mascaró, conjuntamente con el abogado de éste, en dicha demanda en representación de la quiebra contra Financial Credit.

"(2) La Corporación en quiebra Soler & Mascaró Auto Corporation se organizó bajo las leyes de Puerto Rico el 15 de agosto de 1947, con domicilio y oficina principal en el número 359 de la Avenida Ponce de León, Parada 6 y ½ de Puerta de Tierra, para dedicarse a la compraventa de automóviles, camiones, bicicletas, motocicletas, gomas, tubos, accesorios y piezas para vehículos de motor y otros vehículos, maquinarias, aceites, y lubricantes, efectos eléctricos y taller de reparaciones. Se incorporó con un capital pagado de $102,000 de un capital autorizado de $250,000, y siendo sus incorporadores Efraim Soler y su esposa con 340 acciones de $100 cada una, Mariano Mascaró y su esposa con 340 acciones y Oscar Michelena y esposa con otras 340 acciones. La aportación de Mascaró se hizo totalmente en efectivo; la de Soler constituyó de su participación en la sociedad Belaval y Soler, de cuyos negocios se hacía cargo la corporación y la de Michelena de unos $4,000 a $5,000, en efectivo y el resto de su participación en la sociedad Belaval & Soler. Se nombró a Soler Presidente y Gerente, y a Mascaró Tesorero y Secretario, y se acordó adquirir el activo y pasivo de la Mercantil Belaval & Soler & Co. S. en C., a partir de agosto 1, 1947, como una reorganización y continuación de los negocios de ésta.

"(3) Los incorporadores Efraim Soler y Mariano Mascaró tenían vasta experiencia en el negocio de venta al contado y a plazos de vehículos de motor, y sus partes y accesorios. Soler, abogado de profesión aunque no ejercía como tal en Puerto Rico, había trabajado con la firma E. Solé & Cía. y luego formó la Mercantil Belaval & Soler y fue su gestor, dedicadas a dicho negocio. Mascaró desde el 1919 trabajó con firmas vendedoras de automóviles y organizó la Mercantil E. Solé Cía. y fue su gestor.

"(4) En reunión de la Junta de Directores de Soler & Mascaró de 7 de enero de 1948, se acordó elevar el capital pagado de la corporación con los beneficios al 31 de enero de 1948, y se acordó reajustar los sueldos de los oficiales asignándoseles, en adición a la compensación mensual ya pagada, $15,380 a Soler; $15,38 digo $15,380 a Mascaró y $1,240 a Michelena.

"Por acuerdo de la Junta de Accionistas de 14 de febrero de 1948 amplió el capital pagado de Soler & Mascaró hasta $150,000 capitalizando $38,700 de los beneficios montantes a $39,040.05 obtenidos hasta enero 31 de 1948 y emitiendo 93 acciones adicionales a los accionistas. El aumento de capital se hizo por ser necesario a los fines de conseguir el crédito que la corporación necesitaba para desarrollar su negocio.

"(5) Por acuerdo de la Junta de Accionistas de 31 de julio de 1948 se aumentó el capital autorizado de Soler & Mascaró de $250,000 a $1,000,000 y el capital pagado de $150,000 a $300,000. Esto último se efectuó capitalizando mediante dividendo en acciones, $75,000 del beneficio líquido informado al 30 de julio de 1948, montante a $77,596.80,(¹). (La evidencia luego demostró que este beneficio era, al 30 de septiembre de 1948, de $63,626.63, según intervención de la firma Sparrow Waymouth & Co. El beneficio para el año completo, hasta 31 de enero de 1949 fue de $77,943.56.) después de haber descontado una reserva para contribuciones sobre ingresos y $63,000 para ser distribuidos entre los directores, a razón de $30,000 para Soler, $30,000 para Mascaró y $2,400 para Michelena; y emitiendo 750 acciones adicionales de $100 a la par que fueron suscritas y pagadas por Jaime Ramón Brugat. Todo el referido beneficio líquido y un sobrante anterior de $340.05 fue distribuido en acciones en efectivo.

"(6) Soler & Mascaró se dedicaba principalmente a importar automóviles marca De Soto y gomas Goodrich, y los vendía al por mayor a sub-distribuidores, y al por menor en ventas de contado y a plazos. El precio fijado para las ventas a plazos era mayor que el fijado para una venta de contado. Este aumento al precio de contado se hacía para cubrir ciertos gastos de operación adicionales que originaban las ventas a plazos, entre otras cosas, la necesidad de obtener información sobre el crédito del comprador, el mantenimiento de un departamento de cobro con la necesaria contabilidad y expedienteo adicional, equipo y empleados para tal fin, gastos de inscripción y registro de los contratos condicionales e hipotecas de bienes muebles, gestiones de cobro y otros gastos relacionados de funcionamiento, surgidos a partir de la venta de un vehículo a plazos, y hasta el pago del precio total.

"(7) Hasta mediados del año 1948, Soler & Mascaró obtuvo financiamiento para su negocio de ventas a plazos del Banco

Popular de Puerto Rico. Al principio Soler & Mascaró descontaba los contratos de venta condicional y los pagarés individuales de los compradores de vehículos con dicho Banco, y recibía de éste, acreditado a su cuenta corriente, un 90% y luego un 80% del valor del contrato y del pagaré. El 10% y más tarde el 20% restante lo retenía el Banco como reserva y garantía marginal para protección adicional suya. Sobre el 90% y luego el 80% que acreditaba a Soler & Mascaró le cargaba intereses al 5% anual.

"Posteriormente se cambió de sistema. Soler & Mascaró obtenía ahora préstamos directamente del Banco Popular mediante la firma y entrega de su propia obligación, garantizada además personalmente por Mariano Mascaró. Estos préstamos se obtenían hasta un límite de 80% del valor de los contratos condicionales y pagarés de los compradores de vehículos que se cedían y entregaban al Banco junto con la obligación directa de Soler & Mascaró y se cargaba un 5% de interés. El 20% restante quedaba como un margen de seguridad para el Banco.

"(8) Para junio o julio de 1948, la cartera de documentos negociados por Soler & Mascaró con el Banco Popular se acercaba al millón de dólares. El Banco se negó a seguir financiando las ventas a plazos de la corporación basándose en que el capital de Soler & Mascaró no era lo suficientemente grande a tono con dicha cartera y el volumen de negocios en el Banco. La actuación del Banco Popular creó una situación crítica, debido a que Soler & Mascaró no podía funcionar sin el financiamiento de sus ventas a plazos, a menos que tuviera un inmenso capital de operación disponible. Después de gestiones infructuosas con el Banco Popular para que no le retirara el crédito para su negocio al por menor, Soler & Mascaró trató de obtener dicho crédito y el descuento de su cartera en otros bancos locales, sin éxito alguno. Desde la negativa del Banco Popular, y en cuestión de días, ya Soler & Mascaró tenía en su poder unos $70,000 de contratos y pagarés individuales, y cada vez se acumulaban más. Ante la situación, Efraím Soler y Mariano Mascaró decidieron organizar una compañía de financiamiento que se hiciera cargo del financiamiento de los negocios de Soler & Mascaró. Así se concibió la demandada.

"(9) Efraím Soler y Mariano Mascaró se dieron a la tarea de invitar, mediante visitas personales y por cartas, a través de la Isla a un número de hombres de negocios, capitalistas, indus-

triales y profesionales interesándolos en la nueva compañía de financiamiento de ventas, y en la conveniencia de organizarla. Unos aceptaron y otros no, y el 7 de julio de 1948 Efraím Soler, Mariano Mascaró y 13 personas más firmaron un convenio obligándose a suscribir en conjunto y a pagar $237,500 del capital en acciones de la propuesta compañía, expresándose en dicho convenio que tendría por objeto 'la compra, adquisición, negociación, descuento, venta, redescuento de instrumentos negociables (.....) papel comercial (.....), o valores de todas clases'.

"En este convenio Efraím Soler y Mariano Mascaró se obligaron a adquirir $30,000 cada uno en acciones del capital de la compañía. De hecho sólo aportaron $1,000 cada uno, debido a que contaban para la aportación restante con las reservas que Soler & Mascaró tenía en el Banco Popular, y éste se nego a entregarlas.

"El 1ro. de julio de 1948 ya Soler & Mascaró se había dirigido por escrito a los bancos locales informándoles que sus peticiones de crédito se reducían a la línea al por mayor debido a que se estaba organizando una compañía de finanza que se haría cargo de sus negocios. Se explicaba además que esta compañía de finanza recibiría el beneficio de los cargos de financiamiento hechos por los distribuidores de automóviles, que en todos los casos fluctuaba desde 14% a 17% del balance aplazado. También se anticipaba sobre la reserva que retendría la compañía de finanza a organizarse, de un 10% a un 20%.

"(10) El 19 de julio de 1948 la demandada quedó incorporada bajo el nombre de Financial Credit Corporation, para los fines antes expuestos, y para dar dinero a préstamo con o sin intereses. Su capital autorizado fue de $1,000,000, y su capital pagado de $157,500. Se registró su domicilio y oficina principal provisionalmente como el mismo domicilio y oficina de Soler & Mascaró sito en el número 359 de la Avenida Ponce de León. Sus gastos de incorporación fueron sufragados de momento por Mariano Mascaró, aunque luego les fueron reembolsados. En el local de Soler & Mascaró se citó y comenzó a celebrarse el 28 de julio de 1948 la primera reunión de incorporadores y accionistas bajo la presidencia provisional de Mariano Mascaró. Se discutió ampliamente sobre los negocios a que se dedicaría la corporación participando activamente Efraím Soler y Mariano Mascaró, y se nombró un comité, en el cuál estaba Soler, para

que preparara y redactara el plan financiero que serviría de pauta a la corporación en sus operaciones de redescontar papeles comerciales.

"(11) El 4 de agosto de 1948 Financial Credit celebró la segunda reunión de Incorporadores y Accionistas. Mascaró informó de una conferencia suya con William A. Waymouth, de la firma 'Sparrow Waymouth & Co.', sobre la conveniencia de conseguirse el plan de financiamiento de la 'General Motors Acceptance Corporation', ya que este plan había quedado probado en la práctica y en la experiencia de largos años. Siguió informando que pudo obtener información bastante del plan de la General Motors a través de José A. Tulla (luego fue el Gerente General de Financial Credit), y que procedió en unión de Soler y de Tulla a discutir el mismo y a hacer las adaptaciones necesarias de dicho plan de la 'General Motors', según aparecía de un memorándum sometido por Tulla fechado 31 de julio de 1948, copias del cual se habían repartido a los accionistas. Este memorándum fue hecho en mimeógrafo en la propia oficina de Soler & Mascaró. El memorándum contentivo del plan de financiamiento y un memorándum complementario de Tulla fechado 4 de agosto de 1948 fueron entonces ampliamente discutidos en dicha reunión, tomando parte destacada Efraím Soler y Mariano Mascaró. Se hicieron varias enmiendas y modificaciones al plan, y así enmendado, se aprobó. Los tipos o cargos de financiamiento fijados se basaron en la propia experiencia de Soler & Mascaró en esta clase de negocios.

"En esta misma reunión se discutió y se aprobó el Reglamento de la corporación con intervención activa de Soler y de Mascaró, y se eligió una candidatura de directores propuesta por Soler; los Directores se reunieron entonces, y se aprobó la candidatura de oficiales propuesta también por Soler, resultando electos Mariano Mascaró Presidente y Soler Subsecretario.

"A propuesta de Soler se nombró a José A. Tulla para el cargo de Gerente General de la corporación con una compensación de $500 mensuales. Finalmente, Soler informó a los presentes sobre las conversaciones habidas entre él y Rafael Carrión del Banco Popular, a los fines de la concesión de crédito por dicho Banco a la nueva corporación aquí demandada.

"(12) En 18 de agosto de 1948 Financial Credit celebró su segunda reunión de Directores. El Secretario Juan Enrique Géigel dio cuenta de la revisión en forma ordenada del plan de

financiamiento y de operación ya aprobado por los accionistas, con la inclusión de ciertos detalles no incluidos antes. El plan revisado se abrió a discusión, en la cual Efraim Soler llevó la voz cantante y propuso la mayoría de las enmiendas que se hicieron al mismo en sus aspectos fundamentales de financiamiento y de relaciones mutuas entre la corporación y sus futuros clientes. A enmiendas suyas se fijó finalmente la reserva a ser retenida por la corporación sobre el principal de cada contrato en un 5% y se dispuso que la reserva consistiría de dicho 5% y de un bono de 1½% del principal que se acreditarían al comerciante; así como que Financial Credit podría retener dicha reserva hasta un 10% del balance total adeudado de los contratos. Soler tomó parte destacada también en la discusión de la responsabilidad de los clientes de Financial Credit para con ésta, y propuso y fue aceptado que en caso de reposesión o de ejecución, el cliente vendría obligado a tomar el vehículo reposeído o ejecutado. Igualmente Soler discutió y se opuso o combatió todas aquellas enmiendas al plan sugeridas por otros, que a su juicio no eran del todo aceptables para los clientes. Así discutido y enmendado, el plan de financiamiento quedó aprobado en forma definitiva.

"(13) En una reunión de Directores de Financial Credit celebrada el 30 de septiembre de 1948, Mariano Mascaró presentó su renuncia como Presidente, en parte, por su posición en Soler & Mascaró, y porque su persona en la presidencia de Financial Credit podía debilitar la posición de ésta en sus relaciones bancarias. En su carta de renuncia Mascaró expresaba que seguiría colaborando en la corporación, a la que textualmente se refirió como 'fruto de mis iniciativas'. Aceptada su renuncia quedó como Director y Sub-Tesorero.

"(14) En esa misma reunión se aprobó la forma de contrato de financiamiento que debería suscribir todo distribuidor de automóviles o comerciante que deseara descontar su papel comercial con la corporación. Dicho contrato encarnaba el plan de financiamiento ya adoptado, y al igual que éste, seguía fundamentalmente las prácticas generalmente establecidas por las compañías de finanzas en Estados Unidos para esta clase de negocios. El contrato, redactado y aprobado totalmente en inglés, se tituló 'Dealer's Retail Agreement'. El 17 de noviembre de 1948 se firmó el mismo entre Soler & Mascaró y la demandada Financial Credit para regir las relaciones entre ambas en sus

negocios de ventas de financiamiento. A continuación damos una versión al español del referido contrato, en el cual se decía que:

"La suscribiente Soler & Mascaró, deseosa de financiar ventas a plazos de vehículos y camiones de motor, de tiempo en tiempo ofrecería a Financial Credit para compra aquellos contratos de venta condicionales, hipotecas de bienes muebles y otros documentos de gravámenes, aceptables a ésta. Con el fin de inducir a tales compras, Soler & Mascaró hacía las siguientes manifestaciones, afianzamientos, pactos y transacciones:

"1.—Que todos los documentos sometidos representarían obligaciones de pago diferido por las cantidades en ellos expuestas, no sujetas a controversias, compensaciones o contra reclamaciones, de compradores genuinos con capacidad legal para ejecutar dichos documentos, a quienes Soler & Mascaró les hubiera vendido y entregado vehículos de motor o camiones de motor descritos en dichos documentos; que el balance pagadero en plazos, expuesto en todos los documentos, se calcularía sustancialmente de acuerdo con la más reciente tabla suministrada por la demandada; que el pago en efectivo se recibiría y sería hecho según se indicaba en dichos documentos y no había sido anticipado o aportado por Soler & Mascaró; que cada venta se haría a base de un pago mínimo de contado de una tercera parte del costo neto al comprador y un máximo de 18 meses para el pago del balance pagadero a plazos en caso de automóviles o camiones nuevos; a base de un pago mínimo de contado de 40% del costo neto al comprador y un máximo de 12 meses para el pago del balance pagadero a plazos en el caso de automóviles o camiones usados; y, en el caso de automóviles o camiones usados del último modelo del año, a base de un pago mínimo de contado de una tercera parte del costo neto al comprador y un máximo de 15 meses para el pago del balance pagadero a plazos; que los vehículos y camiones de motor descritos en los documentos a la fecha de la compra de los documentos por Financial Credit estarían gravados con una primera hipoteca válida sobre bienes muebles a favor de Soler & Mascaró que sería debidamente inscrita como tal primer gravamen en el Registro correspondiente de hipotecas de bienes muebles, o habían sido vendidos bajo un contrato válido de venta condicional que sería debidamente registrado como tal en el correspondiente Registro de contratos de ventas condicionales; que sería la responsabilidad de Soler &

Mascaró al inscribir dicha primera hipoteca de bienes muebles o dicho contrato de venta condicional; que todos los hechos dentro del conocimiento de Soler & Mascaró manifestados en los documentos y en los estados de créditos acompañando cada documento serían ciertos; y que Soler & Mascaró no tendría conocimiento de hecho alguno que menoscabara la validez de cualquier documento. Que Soler & Mascaró cumpliría totalmente todas las obligaciones de su parte a efectuarse bajo los términos, pactos y condiciones de los documentos, y convenía en indemnizar a la demandada y en exonerarla contra cualquier reclamación de cualquier comprador que surgiera de cualquier documento por vía de defensa, controversia, compensación o contra reclamación, incluyendo, pero no limitando a, demandas para la ejecución por Soler & Mascaró de cualquier acto de su parte a ser efectuado bajo los términos de cualquier documento.

"2.—Que Financial Credit tendría el derecho exclusivo de hacer los cobros de los documentos y de ejercitar acción legal para el cumplimiento de los términos y condiciones de los mismos, o para la reposesión de los vehículos descritos en ellos, o para la ejecución de las hipotecas sobre bienes muebles. Todos los derechos legales, gastos de corte o costas incurridos en ello se cargaría a Soler & Mascaró. Que Soler & Mascaró convenía en no solicitar ni efectuar cobro, reposesión o ejecución alguna bajo ninguno de dichos documentos, excepto según fuera autorizada por Financial Credit de tiempo en tiempo, y convenía en mantener todas las reposesiones o ejecuciones en fideicomiso a favor de la demandada sin cargo para ésta, y entregarlas a la demandada a requerimiento, a menos que por cualquier razón los documentos bajo los cuales la reposesión o la ejecución fue efectuada, hubieran sido comprados de nuevo por Soler & Mascaró de Financial Credit. Que Soler & Mascaró convenía además en tomar cualquiera o todos los vehículos reposeídos o ejecutados cuando la demandada así se lo requiriera. Financial Credit podría continuar el cobro de todos los documentos hasta que los mismos hubieran sido comprados de nuevo o pagados por Soler & Mascaró. Soler & Mascaró anotaría en sus libros la adquisición de documentos por Financial Credit. Financial Credit tendría el derecho de inspeccionar los libros de Soler & Mascaró, cuentas, correspondencia, constancias u otros escritos relativos a los documentos adquiridos por ella bajo este contrato y a extractar de los mismos en cualquier momento. Financial Credit

no vendría obligada a archivar, registrar, rearchivar o entregar documento alguno, sino que Soler & Mascaró convenía en hacerlo con cargo a sí misma, si la demandada lo solicitara.

"3.—Que los pagarés se endosarían en blanco por Soler & Mascaró, "con responsabilidad", y todos los documentos serían cedidos a Financial Credit en la forma y manera que le fuera aceptable a ella, pero si Soler & Mascaró dejara de hacerlo, la demandada o su representante podría poner cualquier endoso o traspaso necesario o apropiado en los mismos y en cualesquiera remesas. Que quedaba convenido que Financial Credit podría, con o sin motivo, rechazar o negarse a comprar cualesquier documentos sometidos a ella, y la aceptación de uno o más documentos no se entendería que la obligaba a aceptar otros documentos. Que Soler & Mascaró convenía pagar cualquier o todos los plazos vencidos bajo cualquiera de los pagarés o documentos endosados a Financial Credit bajo este contrato que se estuvieran adeudando por 30 días o más. Si la deuda continuara en cuanto a tres plazos consecutivos, Soler & Mascaró convenía además en comprar de nuevo a Financial Credit los documentos en que hubiera ocurrido tal deuda por el balance pendiente, menos los cargos de descuento no ganados. Soler & Mascaró se mantendría constantemente informada de todas las deudas u omisiones de pago de cualesquier pagarés o documentos comprados por Financial Credit bajo este contrato, o plazos de los mismos, y su cooperación sería solicitada para obtener el cobro en todo momento en que Financial Credit creyera conveniente solicitar tal cooperación. Prórrogas de tiempo concedidas, y arreglos, transacciones o acuerdos con cualquier comprador bajo tales pagarés o documentos serían efectuados por Financial Credit solamente con la aprobación y el consentimiento de Soler & Mascaró, y después de una inspección física del vehículo y de una reinvestigación de la situación de crédito del comprador. La renuncia de cualquier derecho no operaría como una renuncia subsiguiente de tal derecho, sino que todos los derechos bajo el contrato quedarían en pie no obstante una o más renuncias. El contrato constituiría el único convenio o entendido mutuo entre las partes en relación con la materia objeto del mismo, y ninguna disposición del contrato sería modificada o alterada excepto mediante escrito debidamente firmado por uno de los oficiales debidamente autorizados de Financial Credit.

"4.—Que si Soler & Mascaró fuera requerida bajo los términos del contrato y dejara de comprar de nuevo cualquier documento al no ser cumplido; o si dejara de cumplir cualquiera de los otros términos, pactos y condiciones del contrato; o si una petición fuera archivada por o contra Soler & Mascaró bajo cualquiera de las disposiciones de la Ley de Quiebras o de sus enmiendas; o si se nombrara un síndico a Soler & Mascaró o a cualquier propiedad de Soler & Mascaró; o si en el caso del cobro de una sentencia, un mandamiento de embargo, o un injunction se expidiera contra Soler & Mascaró o contra cualquier propiedad de ésta, o si Soler & Mascaró llamara a reunión a sus acreedores con el propósito de considerar cualquier situación financiera apremiante o amenaza de la misma; o si Soler & Mascaró se convirtiera en insolvente, cometiera un acto de quiebra, hiciera una cesión para beneficio de acreedores, nombrara un comité de acreedores o un agente liquidador, ofreciera un arreglo o una prórroga general a sus acreedores, hiciera o notificara la intención de hacer una venta en bulto; o si Soler & Mascaró se disolviera o cesara de hacer negocios; entonces y en cualquiera de dichos casos Soler & Mascaró compraría de nuevo de inmediato todos los documentos pendientes adquiridos por Financial Credit bajo el contrato y pagaría por ellos a Financial Credit un precio de readquisición igual a la cantidad no satisfecha y adeudada en los mismos, menos el cargo de descuento no ganado, y menos cualquier balance acreedor de Soler & Mascaró en cualquier cuenta general, especial o de reserva con Financial Credit, o a su opción, Financial Credit podría vender dichos documentos en venta pública o privada efectuada por lo menos con 10 días de notificación a Soler & Mascaró enviada por correo ordinario a la última dirección conocida de ésta, en cuya venta, Financial Credit podría ser compradora y Soler & Mascaró satisfaría cualquier deficiencia que aún se adeudara a Financial Credit después de acreditar el producto neto de dicha venta.

"5 (a) Que Financial Credit pagaría a Soler & Mascaró por cualquiera de dichos documentos que fueran aceptables a aquella el 95% del valor neto de venta del vehículo vendido, menos cualquier pago inicial o valor de entrega de cualquier vehículo aceptado por Soler & Mascaró a cuenta, o aquel otro por ciento que fuera mutuamente convenido por ambas partes a la fecha de dicha adquisición. El remanente 5%, junto con el "bono al comerciante" de 1½% de la cantidad financiada en cada contrato

sobre automóviles o camiones nuevos o usados, se acreditaría a una cuenta en los libros de Financial Credit denominada la "Reserva", cuya cuenta constituiría garantía colateral a Financial Credit para el pago de cualquiera o de todas las obligaciones de Soler & Mascaró según se exponen en el contrato, y la cual no sería traspasada, o en forma alguna gravada por Soler & Mascaró sin el previo consentimiento por escrito de Financial Credit. Si al final de cada 3 meses a partir del contrato el crédito de la "Reserva" excediera el 10% del agregado de los balances pendientes vencidos o a vencer en los documentos adquiridos por Financial Credit bajo el contrato, y Soler & Mascaró no estuviera bajo incumplimiento de cualquier acuerdo con Financial Credit, entonces Financial Credit pagaría a Soler & Mascaró de la "Reserva" una cantidad que reduciría la "Reserva" al 10% del agregado de las cantidades pendientes vencidas o a vencer en los documentos adquiridos por Financial Credit bajo el contrato.

"5 (b) Que si el comprador en cualquier documento comprado por Financial Credit bajo el contrato estuviera en descubierto por un período de 3 plazos consecutivos, o en el caso de incumplimiento de una o más de las garantías establecidas en el convenio, Soler & Mascaró compraría de nuevo inmediatamente de Financial Credit, a requerimiento, cualquiera de dichos documentos en descubierto o cualquier documento afectado por el incumplimiento de tal garantía, junto con cualquier otro documento o documentos de tal comprador poseídos por Financial Credit bajo el contrato, y Soler & Mascaró pagaría a Financial Credit por los mismos un precio de readquisición igual a la cantidad no pagada adeudada sobre dicho documento o documentos, menos el cargo de descuento no ganado, y dichos documentos, al efectuarse dicho pago serían cedidos de nuevo, y cualquier pagaré sería devuelto por Financial Credit, todo sin responsabilidad para ésta. En lugar de tal requerimiento, Financial Credit podría cargar la "Reserva" con la cantidad no pagada adeudada en cualquier documento o documentos menos el cargo de descuento no ganado, Financial Credit podría hacer cualquier cargo a la "Reserva" sin notificación a Soler & Mascaró, y hubiera o no requerido a Soler & Mascaró o al comprador, o tomado cualquier otra acción bajo el documento. Todos dichos cargos o pagos a la "Reserva" incluirían reembolsos a Financial Credit de todos los desembolsos incurridos por ésta en relación

con dichos documentos, incluyendo todos los derechos legales, gastos de corte y costas, y honorarios de abogado razonables.

"6.—Que este contrato quedaría en toda su fuerza y vigor a menos que se recibiera notificación por escrito de su terminación por cualquiera de las partes. Las obligaciones de Soler & Mascaró subsistirían después de tal terminación en cuanto a cualquier documento adquirido por Financial Credit con anterioridad a la fecha efectiva de dicha terminación, y con respecto a, cualquier ampliación o modificación de cualquiera de dichos documentos. El convenio se interpretaría de acuerdo con las leyes de Puerto Rico. El contrato se aplicaría a, y obligaría a las partes y a sus respectivos sucesores y cesionarios.

"(15) En la misma reunión de 30 de septiembre de 1948 y en reuniones posteriores, se discutió de nuevo detalladamente, con intervención destacada de Efraim Soler, lo relacionado con la forma en que debían computarse los cargos de financiamiento debido a ciertas dudas surgidas al Gerente General. Se discutió además, con similar participación activa de Soler, y de Mascaró, lo relativo a la clase de documento comercial que se utilizaría por los distribuidores, si hipotecas de bienes muebles o contratos de ventas condicionales. También se instrumentó la parte del plan de financiamiento adoptado referente al seguro de los vehículos, aprobándose el acuerdo de que cada comprador de un vehículo pagaría el importe de un seguro para beneficio del comerciante vendedor y de Financial Credit, o del banco, según fuera el caso; que el montante de la prima de dicho seguro sería cargado al comprador en adición a los cargos de financiamiento; que el distribuidor o comerciante se encargaría de pagar directamente a la compañía de seguros el importe de la póliza para lo cual Financial Credit reembolsaría al distribuidor en cada contrato el montante de la prima a ser pagada, prima ésta que estaría incluida en la cantidad financiada.

"(16) Las partes acordaron que ciertos contratos de venta condicional de vehículos, admitidos en evidencia como Exhibits 39, 39A, 39B del demandante, eran típicos y servían de ilustración de cómo operaba el negocio de Soler & Mascaró en relación con el de la demandada. Veamos el Exhibit 39-A.

"El 7 de septiembre de 1949 Soler & Mascaró y Miguel Otero Chaves firmaron un contrato impreso de venta condicional en

virtud del cual el segundo compró a la primera un automóvil nuevo marca De Soto, por el precio de $2,861.74. El comprador entregó a la vendedora como pago inicial otro vehículo valorado en $1,396.00. La diferencia de $1,465.74 se obligó a pagarla el comprador a la vendedora, o a sus cesionarios, en la oficina de Financial Credit en Santurce, en 17 plazos mensuales de $80.00 cada uno y un plazo de $105.74 a vencer el primero, el 7 de octubre de 1949 y el último, el 7 de marzo de 1951. Además, el comprador suscribió en igual fecha y entregó a la vendedora un pagaré personal por el total de la deuda, como evidencia de ésta. Entre otras cláusulas y condiciones comúnmente usadas en ventas condicionales, en el contrato se dispuso que en caso de atraso en el pago de alguno de dichos plazos, el mismo devengaría intereses de mora al 9% anual, así como que si el comprador dejara de pagar puntualmente a su vencimiento uno de los plazos, o si dejara de cumplir ciertas otras obligaciones, en adición al total de la deuda que quedaría vencida, a sus intereses de mora y de los gastos incurridos para el cobro de tales plazos, pagaría una cantidad líquida de $24.00 por concepto de honorarios de abogado por cada plazo envuelto.

"Al final del contrato aparece en forma impresa una cesión y traspaso en donde Soler & Mascaró, bajo firma de Mariano Mascaró, expresó en la misma fecha del contrato que por valor recibido a entera satisfacción cedían y traspasaban a Financial Credit Corporation, sus herederos, cesionarios o causahabientes, la totalidad del contrato de venta condicional anterior, y todo derecho, acción, causa de acción e interés que Soler & Mascaró pudiera tener en el referido contrato, en el vehículo de motor descrito en el mismo y en el pagaré que el comprador suscribió a favor de Soler & Mascaró conjuntamente con el otorgamiento de dicho contrato. Expresamente se autorizó a Financial Credit, sus herederos, cesionarios o causahabientes, a ejercitar en su propio nombre, o a nombre y representación de Soler & Mascaró, toda y cualquier acción judicial o extrajudicial, o cualquier remedio que Soler & Mascaró hubiera podido ejercitar personalmente de no haberse hecho esta cesión. Soler & Mascaró se obligó mancomunada y solidariamente a favor de Financial Credit, sus herederos, cesionarios o causahabientes, como garantizadores del comprador en el cumplimiento del pago por dicho

comprador de los plazos mensuales especificados en el contrato objeto de la cesión y en el pagaré suscrito conjuntamente con el mismo, así como en el cumplimiento de las demás obligaciones, condiciones y estipulaciones, términos y estipulaciones contenidas en dicho contrato. Se dijo finalmente que esta cesión y traspaso se hacía sujeto a todas las condiciones, términos y estipulaciones contenidas en el contrato titulado "Dealer's Retail Agreement" que había sido firmado por la suscribiente con Financial Credit Corporation con anterioridad a esa fecha, todos los cuales se considerarían como parte integrante y esencial de esta cesión de derechos.

"Aparecen en el expediente de este contrato, (Exhibit 39-A del demandante) además del original del mismo, los siguientes documentos en forma bajo el encabezamiento impreso de Financial Credit: (a) solicitud de crédito firmada por Otero Chaves e información personal; (b) comunicaciones a Financial Credit de una firma comercial y de un banco sobre referencias del comprador; (c) copias de una tarjeta contentiva de los pagos mensuales hechos por Otero Chaves; (d) carta de Financial Credit a Chaves de 10 de abril de 1951 cobrándole el balance final más ciertos intereses de mora acumulados hasta esa fecha; y (e) un impreso bajo encabezamiento de Financial Credit titulado "Informe de Venta" (Work Sheet) fechado 12 de septiembre de 1949 preparado y suscrito por Soler & Mascaró bajo la firma de Mariano Mascaró. En este último documento aparece la siguiente liquidación hecha por Soler & Mascaró:

1. Precio al contado incluyendo impuesto..................... $2,596.00
2. Pago inicial efectivo (valor carro tomado)............... 1,396.00
3. Balance deudor del precio al contado.................... 1,200.00
4. Premios de Seguros.................................... * 32.68

(Otra prueba demostró que este seguro era de $32.30 y no de $32.68 y que Soler & Mascaró cargaba por seguro cantidades mayores que las fijadas por las compañías aseguradoras.)

5. Balance a financiar.................................... 1,232.68
6. Diferencial (cargos por Financiamiento)................. 233.06

7. Balance a pagar a Plazos............................. 1,465.74
8. Plazos de...... 1 × $105.74
 17 × $80.00
9. Precio total de Venta (2 más 7)........................ $2,861.74

En este mismo documento hay un encasillado dentro de un cuadro bajo el título "Distribución" donde aparece lo siguiente anotado en lápiz: Distribución:

| | | |
|---|---:|---:|
| Total Pagarés | | $1, 465. 74 |
| Principal | $1, 252. 77 | |
| Diferencia | 212. 97 | |
| | 1, 465. 74 | |
| Cargos Finanza | $194. 18 | |
| Bonificación | 18. 79 | 212. 97 |
| | | 1, 252. 77 |
| Reserva | | 62. 64 |
| Neto al Dealer (Ck Núm. 807)* | | 1, 190. 13 |

(Fue el cheque Núm. 808).

"La demandada obtuvo las cantidades de financiamiento que aparecen bajo el encasillado "Distribución" de la siguiente manera:

"Al balance deudor del precio de contado de $1,200.00 se le sumó el importe de la prima de seguro expedida para beneficio único de Soler & Mascaró y de la demandada, como si fuera parte del costo del vehículo al comprador, obteniéndose un balance deudor a financiar de $1,232.68. Aplicando los tipos de financiamiento según el plan y el contrato de operación aprobados, esto es 13½% (9% por un año, 4½% por los restantes 6 meses) más 2% de cargos de operación, más 1½% de bono para el distribuidor, un total de 17%, y dividiendo el balance total adeudado de $1,465.74 entre 117 (100% de principal más el 17% mencionado de cargos) la demandada obtuvo el principal del contrato montante a $1,252.77.(²) (Procede observar que siendo la deuda del comprador de sólo $1,232.68 incluyendo el seguro, los cargos de financiamiento se computaron sobre un principal mayor de $1,252.77. A base de la deuda efectiva, incluyendo el seguro del cual no se beneficiaba el comprador, el cargo de financiamiento ha debido ser de $209.55 que sumados a la deuda, el total sería de $1,442.23, en lugar de $1,465.74. Si el comprador hubiera tomado a préstamo la diferencia de $1,200 a fin de comprar el vehículo de contado, para pagar dicha suma en los mismos 18 meses y en los mismos plazos, hubiera pagado unos $85.00 de intereses al tipo máximo permisible, comparado con los $233.06 que tuvo que pagar.) Calculó entonces 17% sobre este principal de $1,252.77 lo cual montó a $212.97 que representa

el cargo de financiamiento. Calculó igualmente la bonificación para Soler & Mascaró de 1½ sobre $1,252.77, obteniendo $18.79. Calculó la reserva multiplicando el mismo principal de $1,252.77 por 5%, que dio $62.64. El principal a financiar calculado de $1,252.77 más el cargo de financiamiento de $212.97 suma la cantidad total aplazada de $1,465.74, que el comprador debía pagar en 18 plazos.

"Del cargo de $212.97 la demandada acreditó a Soler & Mascaró $18.79 que representa el bono de 1½% y retuvo para sí, la diferencia de $194.18. Envió un cheque a Soler & Mascaró por $1,190.13, que con $62.64 que representa el 5% retenido como reserva para serle acreditado, suman el principal a financiar del contrato, montante a $1,252.77.

"De acuerdo con lo anterior, Soler & Mascaró recibió en total, ya que en este caso el comprador satisfizo todos los pagos: (a) de inmediato, $1,396.00 en el valor del automóvil tomado a cuenta, más $1,190.13 de Financial Credit, o sea $2,586.13, cantidad ésta que es sólo $9.87 menos que el precio de contado del vehículo; y (b) $81.43 acreditados a su favor por concepto de reserva de bono, un total de $2,667.56, comparado con el precio al contado de $2,596. Financial Credit recibió como ganancia bruta $194.18.

"(17) Según el informe de venta del contrato de Otero Chaves a que nos hemos referido, Soler & Mascaró computó un balance total a pagar por el comprador de $1,465.74, adicionando al balance pendiente de $1,200 del precio en efectivo, más $32.68 importe del seguro, la cantidad de $233.06 de cargos de financiamiento. Entre la demandada y Soler & Mascaró, los cargos de financiamiento montaron sólo a $212.97. Ello se debió a que para fines del comprador, Soler & Mascaró usó cargos de financiamiento mayores que los suministrados y utilizados por Financial Credit. De haber utilizado Soler & Mascaró los tipos de la demandada, la cantidad de $1,465.74 sobre la cual Financial Credit calculó el principal del contrato hubiera sido menor; el principal de $1,252.77 que sirvió de base a Financial Credit para el financiamiento hubiera sido más bajo; el cargo de financiamiento montante a $212.97 hubiera sido aún más reducido; y el precio total a plazo del vehículo para el comprador hubiera sido inferior. Con esta práctica de Soler & Mascaró, de cargar al comprador tipos más altos de financiamiento que los utilizados entre ella y la demandada, se creaba una situación

más onerosa para el comprador del vehículo y más beneficiosa para Soler & Mascaró, y hasta cierto punto, para la demandada también.

"(18) Durante el tiempo en que duraron las operaciones de financiamiento de contratos de ventas condicionales, desde aproximadamente el 22 de noviembre de 1948 hasta aproximadamente el 31 de enero de 1950, Financial Credit financió 891 contratos de Soler & Mascaró por un valor total de $1,135,293.88. De los 891 contratos Soler & Mascaró tuvo que responder parcialmente en alrededor de 71 de ellos hasta una cantidad de $43,794.98 que fue o pagada o cargada contra sus reservas. El remanente de $1,091,498.90 hasta completar $1,135,293.88 fue pagado por los compradores de vehículos. La demandada recibió, pagado por los compradores y en defecto de éstos por Soler & Mascaró, la totalidad del valor de los contratos montante a $1,135,293.88.

"A base de lo anteriormente expuesto, Soler & Mascaró tuvo que responder parcialmente en un 8% más o menos de los contratos financiados con la demandada. Los compradores de vehículos pagaron a Financial Credit algo más de un 97% del valor total de los contratos.

"(19) A cambio de los contratos financiados con un valor de $1,135,293.88 la demandada pagó de inmediato en efectivo a Soler & Mascaró en remesas periódicas que hizo entre el 22 de noviembre de 1948 y el 31 de enero de 1950, la cantidad de $932,827.49. En adición, le acreditó en sus libros el 5% retenido como reserva, que ascendió a $49.043.26. Este crédito, más la cantidad anterior remesada, montan a la suma de $981.870.25 que representa el principal financiado del total de los contratos. La demandada le acreditó además el bono de 1½% que montó a $14,749.71. Dichas remesas periódicas iban por lo regular acompañadas de un volante que expresaba que eran por la compra de un número de contratos, y además, se acompañaba un desglose de los mismos conteniendo el nombre del comprador del vehículo, el balance o precio a pagar, la cantidad del principal de cada contrato que se remesaba en efectivo, el monto del 5% de dicho principal que se retenía como reserva, el monto del bono de 1½% a favor de Soler & Mascaró, y la cantidad que correspondía a la demandada.

"Entre lo remesado en efectivo y lo acreditado a favor suyo en los libros de la demandada, a Soler & Mascaró le correspondió

de acuerdo con el plan financiero de operación y el contrato, sin considerar por ahora la liquidación final que se hizo de sus reservas, la cantidad de $996,620.46 del valor del $1,135,293.88. A la demandada le correspondió la diferencia de $138,673.42 como beneficio suyo en estas transacciones.

"(20) Distinto al sistema seguido con el Banco Popular, Soler & Mascaró nunca firmó, en relación con el financiamiento de dichos contratos, obligación o pagaré propiamente suyo a favor de la demandada por las cantidades que recibía en dichas remesas. Entregaba a Financial Credit mediante cesión y traspaso, los contratos originales de venta condicional y los pagarés personales de los compradores de vehículos. Como cuestión de hecho, Soler & Mascaró en momento alguno devolvió dentro dei término o plazo a Financial Credit las cantidades que recibió de ésta a través de las remesas periódicas referidas.

"(21) La reserva de 5% del principal de cada contrato que la demandada retenía, así como el bono de 1½%, no constituía de inmediato dinero efectivo de Soler & Mascaró en poder de la demandada. De inmediato dichas reservas eran solo un asiento en los libros de la demandada a favor de Soler & Mascaró. A medida que el comprador del vehículo iba pagando a Financial Credit, o a Soler & Mascaró para Financial Credit, sus plazos mensuales, las reservas iban representando en igual proporción dinero efectivo de Soler & Mascaró en poder de la demandada. Sólo cuando el comprador pagaba la totalidad de sus plazos, en 12, 15 ó 18 meses, tales reservas constituían dinero en su totalidad. No obstante, cuando dichas reservas sobrepasaban un 10% del total del balance pendiente de pago en determinado momento, Soler & Mascaró tenía derecho a recibir dicho exceso aún cuando en ese momento los compradores no hubieran pagado todos los plazos adeudados, siempre y cuando que hubiera cumplido sus obligaciones bajo el contrato firmado entre ambas.

"Antes de febrero 12 de 1952 en que la demandada, cumpliendo una orden de la Corte de Estados Unidos para Puerto Rico, sometió al Síndico aquí demandante una liquidación final de sus negocios con Soler & Mascaró y de las cuentas de reservas, la demandada en momento alguno entregó a Soler & Mascaró en dinero efectivo parte de dichas reservas, ni Soler & Mascaró solicitó dicha entrega. Particularmente, no hizo tal solicitud de entrega allá por los meses de marzo y de junio de 1950. El Síndico pidió a la demandada dichas reservas, y ésta se negó

alegando que Soler & Mascaró había dejado de cumplir con obligaciones a ser cumplidas bajo el contrato de 17 de noviembre de 1948, y de cuyo cumplimiento respondían las reservas.

"(22) El dinero efectivo que representaban las reservas a favor de Soler & Mascaró en poder de la demandada, nunca se mantuvo en fondo separado o en fideicomiso. El contrato de financiamiento firmado entre las partes no dispuso expresamente sobre el particular, y Soler & Mascaró en momento alguno requirió a la demandada a tal efecto, ni se opuso a que este dinero estuviera mezclado con los fondos generales de la demandada. De hecho, hubo momentos en que los depósitos bancarios de la demandada eran menores que las reservas acreditadas. En la contabilidad de la demandada las reservas eran sólo una cuenta a pagar que formaba parte de su pasivo, y que estaba respaldada con todo su activo. Soler & Mascaró recibía mensualmente un informe de las operaciones y de las cuentas de la demandada, y de dichos informes mensuales no aparecía que los fondos de las reservas se mantuvieran segregados.

"(23) La demandada tenía establecido y en funcionamiento, con independencia de Soler & Mascaró, un sistema integrado para determinar, sobre la concesión o no de crédito a los compradores de vehículos, y para el cobro efectivo de los plazos mensuales, incluyendo labor de oficina y personal de investigación fuera de oficina. Tan pronto se le ofrecía un determinado contrato, la demandada se dirigía al comprador condicional notificándole de ello y solicitándole información, e investigaba su crédito y demás condiciones personales. Una vez que se firmaba dicho contrato, la demandada se dirigía de nuevo al comprador dándole la bienvenida como un cliente suyo, incluyéndole un libro de cupones impresos para facilitar cada pago, así como las instrucciones necesarias para efectuar los mismos directamente a ella. Vencido un plazo y no satisfecho, la demandada enviaba al comprador una serie de avisos periódicos requiriéndole de pago, enviaba a sus agentes a investigar al deudor y a determinar la situación y el estado del vehículo, y finalmente, le requería varias veces a través de sus abogados, después de lo cual, entablaba en corte la acción legal pertinente.

"No obstante lo anterior, ya fuera por preferencia del cliente, o por conveniencia o relaciones del negocio, la labor de cobro, y la disposición de vehículos entregados o reposeídos se hacía por lo regular, con intervención y cooperación tanto de la demandada

como de Soler & Mascaró. Soler & Mascaró tenía establecido su propio departamento de cobro con personal para tal fin, ya que además de los contratos financiados con la demandada, Soler & Mascaró tenía que atender el cobro de la cartera en poder del Banco Popular, y de contratos en poder suyo.

"(24) En noviembre 11 de 1948 Soler & Mascaró quedó instalado en su nuevo local en un edificio de 5 plantas sito en la Parada 11, Avenida Fernández Juncos, propiedad de Mariano Mascaró. En este local Soler & Mascaró pagaba $2,500 de alquiler mensualmente comparado con $500 que pagaba en su antiguo local de la Avenida Ponce de León, Parada 6 y ½ de Puerta de Tierra. El nuevo local tenía servicio de aire acondicionado y de ascensor pagado por Soler & Mascaró. Fue decorado, con cargo también a Soler & Mascaró a un costo de unos $12,000 a $15,000, y en adición al canon de $2,500 de alquiler, Soler & Mascaró pagaba las contribuciones del edificio, los gastos de su mantenimiento y conservación, un seguro del edificio contra incendio y de responsabilidad pública, así como cualquier otro seguro y gastos de operación y mantenimiento. El nuevo local requirió aumento de personal y de equipo. Se instaló en él un taller de reparaciones que en opinión de algunos accionistas estaba excesivamente equipado con maquinaria que no toda se usaba, a un costo de $40,000 más o menos.

"En una intervención realizada por la firma Sparrow Waymouth & Co., en los negocios de Soler & Mascaró para el año fiscal comprendido entre febrero 1, 1948 y enero 31, 1949, aparece de un estudio comparativo, que los gastos de operación de Soler & Mascaró representaron un 30% del ingreso bruto entre febrero 1 y septiembre 30, 1948 mientras la corporación funcionó en su local de Puerta de Tierra, y entre octubre 1, 1948 y enero 31, 1949, dichos gastos de operación representaron un 85% del ingreso bruto durante dicho período. Eso, no obstante, el hecho de que durante este último período de 4 meses, el ingreso bruto fue un tanto mayor en proporción al ingreso bruto del período de 8 meses anterior.

"(25) Desde temprano en el año 1949, ya Soler & Mascaró estaba operando con dificultad, a pesar de su activo. La situación se acentuó mucho más para los meses de agosto y septiembre en adelante, en que a juicio de su principal accionista, la situación era caótica. En agosto de 1949 Efraim Soler fue relevado de la gerencia por los demás directores y accionistas, sustituyén-

dosele por Mariano Mascaró. Se acusó a Soler de mala administración y de haber retirado fondos para fines personales, aunque con cargo a sus beneficios; de haber incurrido en un exceso inusitado en los gastos de la corporación en relación con los ingresos, gastos estos que en lugar de hacer producir más, habían tenido el efecto de disminuir los beneficios. Después de su retiro de la gerencia, Soler ocupó la dirección del departamento de ventas en donde determinaba los precios de los vehículos nuevos y tomados a cuenta y los asuntos de crédito a concederse. Aun en este cargo, se le imputó que no cooperaba con los directores en la política de economías implantada y de reducción drástica de gastos. Al tiempo de cesar en la gerencia, Soler había retirado unos $30,000, y luego, como jefe de ventas con menos sueldo, exigió además una cuenta abierta a su favor contra la cual giraba para uso personal.

"En una intervención de los negocios de Soler & Mascaró realizada por la firma Sparrow Waymouth a petición del Banco Popular, y que cubrió el período de febrero 1 a septiembre 30, 1948, dicha firma sometió un informe que contenía severas críticas sobre el funcionamiento de la corporación, entre otras, y aparte de errores técnicos, la existencia de una contabilidad incorrecta y manejada descuidadamente que no permitía a la dirección conocer a intervalos regulares la situación financiera de la corporación, ni la situación de los balances aplazados a su favor; contabilidad atrasada de las cuentas a recibir que no se mantenían al corriente y que demostraba una liberalidad excesiva en la concesión de descuentos a los clientes; un control interior de la compañía débil e inadecuado; el pago de un dividendo sin haber sobrante suficiente, lo cual creó a septiembre 30, 1948 un déficit de $13,773.32; un sobregiro en la cuenta corriente del Banco Popular a septiembre 30 de $166,182.34; contabilización y manejo inadecuado del efectivo corriente; el retiro de fondos para uso de oficiales y empleados y otras críticas que aparecen en dicho informe admitido en evidencia. El dinero retirado por oficiales y empleados ascendía a $9,701.06 en septiembre 30, 1948. Al finalizar el año en enero 31, 1949, dicha cantidad había subido a $31,522.10.

"(26) Para octubre de 1949 Soler & Mascaró había dejado de pagar unos $80,000 de arbitrios sobre vehículos y tenía además una deuda de la contribución sobre ingresos, adeudando al Tesoro un total de $126,139.26 de contribuciones. El entonces

Tesorero de Puerto Rico presionó el cobro y se llegó a un acuerdo mediante el cual se haría un pago de $12,000.00 de inmediato, y el balance en un primer abono de $10,000 en noviembre 5, de 1949 y abonos mensuales sucesivos no menores de $5,000. Soler & Mascaró abriría en el Banco Popular una cuenta especial en la que se depositaría todo el dinero producido en la venta de piezas y accesorios y por el departamento de servicios para el pago de dichos abonos mensuales, y se constituiría hipoteca de bienes muebles a favor del Tesorero por la suma de $50,000 sobre el mobiliario de oficina y equipo y maquinaria de los talleres. Además, se daría en prenda por los accionistas 2,000 acciones comunes de la corporación.

"(27) Para octubre de 1949 Soler & Mascaró adeudaba seguros, cobrados a los clientes o recibidos de la demandada y que no había satisfecho a la compañía aseguradora, montantes a $18,010.34. Mediante un arreglo se acordó que dicha suma se pagaría en plazos mensuales. A diciembre 30, 1949 se debían dos de dichos plazos vencidos y se había incurrido en una deuda adicional de seguros de $4,810.27. Por carta de esta fecha, la compañía de seguros amenazó con cancelar las pólizas. Por carta de la misma compañía de 10 de marzo de 1950 se notificó a Soler & Mascaró la cancelación definitiva de los seguros, así como a los dueños de vehículos, para que se entendieran con Soler & Mascaró en cuanto a la devolución de las primas del seguro cancelado. En comunicación de la misma compañía de 16 de marzo de 1950 se ratificaba a Soler & Mascaró que la deuda de seguro ascendía a $19,189.04, y que se entablaría procedimiento judicial para el cobro de dicha cantidad contra ella y contra Financial Credit como co-asegurados en dichas pólizas.

"(28) Los compradores de vehículos cuyos seguros quedaron cancelados acudieron a Soler & Mascaró, a Financial Credit y al Síndico aquí demandante en reclamación de la parte de la prima pagada que se canceló, y después de alguna consideración del asunto la demandada optó por devolver a cada comprador,· a través de una rebaja en el último plazo a pagarse, el montante de dichas primas canceladas que ascendió en total a $5,217.74. Esta cantidad así devuelta se cargó luego por la demandada contra la reserva de Soler & Mascaró. Al efectuarse dichas devoluciones a los compradores de vehículos, ya Soler & Mascaró se hallaba en quiebra.

"(29) En el curso de sus relaciones con la demandada, Soler & Mascaró dejó de cumplir con obligaciones que se impuso en el convenio de financiamiento e incurrió en actos y omisiones en violación de dicho convenio y de los acuerdos mutuos a virtud del mismo. Entre otras cosas, Soler & Mascaró dejó de pagar plazos no pagados por los compradores de vehículos, dejó de adquirir nuevamente de la demandada aquellos contratos en que la falta de pago ocurrió en tres o más plazos consecutivos; dejó de adquirir dichos contratos en los casos de reposesión y de hacerse cargo de los vehículos reposeídos o entregados, pagando a la demandada el balance pendiente de la deuda. En determinada ocasión y debido al proceder de Soler & Mascaró, la demandada situó empleados suyos en la caja de Soler & Mascaró para supervisar los cobros y velar porque el dinero se remesara prontamente a ella, así como para supervisar la disposición de los vehículos reposeídos que la demandada depositaba con Soler & Mascaró. La demandada enviaba estados mensuales a Soler & Mascaró de sus operaciones en donde aparecían liquidadas las reservas de ésta con los gastos incurridos en los procedimientos de reposesiones o para la disposición de los vehículos reposeídos o entregados, y con el montante de las pérdidas habidas en aquellos casos en que la venta del vehículo reposeído o entregado no cubría la deuda pendiente más los gastos incurridos.

"(30) En reunión de la Junta de Directores de Soler & Mascaró celebrada el 23 de enero de 1950, el Presidente Mascaró dio cuenta del estado económico de la corporación como sumamente crítico, expresando que se debía a falta de numerario para afrontar las cuantiosas obligaciones de la corporación, a no haberse conseguido del Banco Popular crédito para la importación de vehículos nuevos y para el financiamiento del negocio al por mayor, a la negativa del Banco a liberar una parte de las reservas marginales; y a los inconvenientes con Financial Credit en la negociación del papel de clientes debido a la dificultad de inscripción de los contratos por razón de disposiciones de la Comisión de Servicio Público y del Departamento del Interior, sobre todo en los casos de vehículos públicos. En esta reunión se acordó ofrecer en venta la corporación a un grupo interesado, por $160,000, de no obtenerse un precio mayor.

"(31) Debido a la situación crítica de Soler & Mascaró, el Banco Popular le retiró, esta vez, la línea de crédito al por mayor para importar vehículos y piezas. Como consecuencia de ello

en reunión de Directores de 14 de febrero de 1950 se acordó renunciar a la línea de los productos De Soto, antes de que dicha línea le fuera retirada. Se dijo que en vista de la pérdida de dicha línea, y quedando la corporación sin agencias, Soler & Mascaró debía ir a una liquidación. En reunión posterior de accionistas efectuada el 27 de febrero de 1950, se adoptó el acuerdo final de acudir a la Corte de Estados Unidos en un procedimiento de arreglo bajo el Capítulo X de la Ley de Quiebras. El 28 de marzo de 1950 se radicó en Corte la petición.

"(32) La renuncia por Soler & Mascaró de la línea De Soto provocó una reunión extraordinaria de la Junta de Directores de la demandada en donde confirmado el hecho por el propio Mascaró, quien además informó que se había acordado ir a una liquidación de Soler & Mascaró, la demandada acordó suspender de inmediato el financiamiento de contratos de aquélla.

"(33) A la fecha en que acudió a la Corte de Estados Unidos en marzo, y luego de ser adjudicada en quiebra en julio, 1950, Soler & Mascaró tenía reservas a su favor retenidas en el Banco Popular desde el comienzo de sus operaciones por unos $39,406.46. En febrero 28, 1950 tenía también reservas acreditadas en Financial Credit pendientes de liquidar, montantes a $63,667.60 que representaban $12,557.19 en exceso del 10% del balance total en pie, ascendente en esa fecha a $511,104.12. Para julio 1, 1950 las reservas acreditadas en Financial Credit pendientes de liquidar montaban a $63,748.76, que representaba $36,118.31 en exceso del 10% del balance en pie de $276,304.52. Ninguna de dichas entidades entregó para esas fechas parte alguna de estas reservas.

"(34) Durante el período de crisis Mariano Mascaró trató de levantar fondos para la corporación, pero los accionistas se negaron a aportar más, aunque estaban económicamente en condiciones de hacerlo. El principal accionista Jaime Ramón, quien tenía invertido $82,500 en la corporación, entendía que el problema no era uno de aportar más dinero sino uno de estricta economía y reducción de gastos que eran mayores que los ingresos, y que en las circunstancias existentes una aportación de $20,000 a $25,000 era como caer en saco roto y no salvaba la situación.

"(35) En junio 27, 1950 se reunió la Junta de Directores de Soler & Mascaró, y después de una exposición del Presidente Mascaró en que hacía constar el fracaso de todo intento de seguir

funcionando por falta de crédito y la falta de efectivo para satisfacer los gastos más perentorios tales como los sueldos de los empleados debido a que el producto de la venta de piezas había que destinarlo al Tesorero bajo el plan para el pago de las contribuciones adeudadas, y a la imposibilidad de adquirir vehículos nuevos y la reducción en las ventas, se acordó que Soler & Mascaró fuera a la quiebra. A petición propia, se le adjudicó en quiebra voluntaria el 17 de julio de 1950.

"(36) A partir de la quiebra Financial Credit enviaba al Síndico aquí demandante un estado mensual de los asuntos de Soler & Mascaró, conteniendo el montante de las reservas y los cargos y créditos que se hacían contra la misma. En 12 de febrero de 1952 se envió al Síndico una liquidación final certificada como correcta por la firma Sparrow Waymouth, y cheques a favor del Síndico montantes a $27,812.44. De esta cantidad, $14,638.71 representaban la liquidación final de las cuentas de reservas propiamente. Se envió al Síndico igualmente los contratos de Soler & Mascaró aún pendientes, una relación de los vehículos reposeídos y el sitio donde estaban depositados y una relación de las personas cuyos seguros fueron cancelados y a quienes la demandada se los acreditó en el último plazo, en la suma total de 5,217.74.

"A marzo 31, 1950 la cartera de Soler & Mascaró en Financial Credit montaba a $443,152.03. Mediante gestiones de cobro de la demandada, dicha cartera estaba reducida a $10,836.18 a febrero 12, 1952, fecha de la liquidación final.

"(37) En enero 31, 1948 Soler & Mascaró informó un beneficio por el período de operaciones de $39,040.05 después de la contribución sobre ingresos, de cuyo beneficio, $38,700 se capitalizaron como dividendos en acciones.

"A base de un beneficio informado de $77,596.80 a julio 30, 1948, se aumentó el capital en $75,000 mediante capitalización del mismo y se repartió el resto. Durante todo el año de febrero 1, 1948 a enero 31, 1949, Soler & Mascaró tuvo un beneficio, según intervención de la firma Sparrow Waymouth, de $77,943.56.

"(38) Financial Credit tuvo un beneficio desde su incorporación hasta septiembre 30, 1949, de $46,742.33 después de reserva para la contribución sobre ingresos, y a septiembre 30, 1950, de $70,095.28 después de la contribución, según intenvenciones de la firma Sparrow Waymouth & Co. Durante el pe-

ríodo de octubre, 1948 a septiembre 30, 1949 Financial Credit tuvo un beneficio bruto de $110,981.20 por concepto de cargos de financiamiento. De octubre a septiembre 30, 1950, dicho beneficio fue de $179,692.94.

"(39) El Tribunal determina que el contrato firmado entre Soler & Mascaró y la demandada Financial Credit en 17 de noviembre de 1948 titulado en inglés 'Dealer's Retail Agreement' como cuestión de hecho, y aparte del efecto jurídico que se resuelva tuvo el mismo, no fue un contrato simulado, ni fue hecho contra la voluntad de Soler & Mascaró, ni bajo engaño, coacción o presión de la demandada, ni en ignorancia o desconocimiento Soler & Mascaró de sus términos, obligaciones y pactos y de los términos y cláusulas del plan de operaciones de financiamiento de la demandada que sirvió de base a dicho contrato. Tampoco fue dictado, preparado y redactado por la demandada con motivo de la petición de un préstamo hecha a ella por Soler & Mascaró.

"El Tribunal determina que al firmarse el contrato de 17 de noviembre de 1948 las contratantes tuvieron, como cuestión de hecho, la intención y el propósito de realizar las transacciones descritas en dicho contrato y no otras, cualquiera que sea el efecto jurídico de dichas transacciones, y de imponerse recíprocamente los derechos y obligaciones que se hacen constar en el referido contrato, sin que fuera la intención de Soler & Mascaró realizar transacciones distintas a las descritas en la faz del mismo. En efecto, el Tribunal determina que todas las operaciones realizadas entre Soler & Mascaró y la demandada bajo el contrato de 17 de noviembre de 1948, independientemente de la interpretación jurídica de dicho contrato o de sus cláusulas fueron, como cuestión de hecho, de la clase y de la naturaleza allí pactadas y no se desviaron de las mismas.

"El negocio a plazos de Soler & Mascaró requería un considerable capital de operación disponible. Al dejar de suplir el Banco Popular este capital de operación, y negarse los demás bancos a ofrecerlo, Soler & Mascaró creó la corporación demandada utilizando conocidos y reputados hombres de negocio, profesionales y capitalistas, con el fin primordial de que sirviera como instrumento o brazo auxiliar suyo en este aspecto de su negocio, no obstante el hecho de que la demandada luego hizo transacciones con otras personas y entidades. A través de la demandada Soler & Mascaró obtuvo en forma indirecta de los

bancos, después de perderlo en forma directa, el financiamiento de su negocio, ya que no obstante el capital de la demandada ésta a la vez hacía sus operaciones con dinero tomado al banco.

"El funcionamiento financiero de la demandada, de modo que resultara ser el instrumento útil para lo cual Soler & Mascaró la organizó, fue también creación, en gran parte, de Soler & Mascaró. La cantidades bajo el nombre de cargos de finanza que como sobrecargo al comprador de un vehículo tenía que pagar en exceso del balance dejado pendiente, fueron el resultado de la acción concertada de ambas, Soler & Mascaró y la demandada. Bajo esta acción concertada ese sobrecargo le era impuesto al comprador como parte de un precio a plazo fijado a entera libertad de la vendedora, y sin intervención alguna del comprador que no fuera para no aceptar comprar el vehículo. Soler & Mascaró y la demandada luego se repartirían el sobrecargo sujeto a cierta fórmula establecida en el plan de financiamiento que se adoptó para la demandada y en el contrato de 17 de noviembre de 1948 que la demandada y Soler & Mascaró firmaron. Este plan y este contrato, sus propósitos y alcances, eran del conocimiento de Soler y Mascaró desde el momento mismo en que se idearon.

"(40) El Tribunal determina, como cuestión de hecho, que la demandada mantenía mezclado con sus fondos el dinero que representaba las reservas acreditadas a favor de Soler & Mascaró. A falta de segregación, cabe concluir que la demandada hizo uso de dicho dinero en sus operaciones. Dichas reservas no fueron constituídas o depositadas por Soler & Mascaró a requerimiento de la demandada, sino que eran parte de los acuerdos y pactos contenidos en el contrato firmado el 17 de noviembre de 1948. Como cuestión de hecho, la demandada cargó contra dichas reservas y descontó de las mismas, cantidades dejadas de pagar por los compradores condicionales, y sus intereses; gastos y desembolsos incurridos en la gestión de cobro incluyendo gastos habidos en los procedimientos de reposesión, y en la conservación, guarda, mantenimiento y reparación de vehículos reposeídos o entregados; así como las pérdidas habidas en los casos en que la venta del vehículo reposeído o entregado no cubría la deuda más los desembolsos incurridos.

"Como cuestión de hecho, Financial Credit ejecutó contratos de venta condicionales de Soler & Mascaró, reposeyó vehículos.

y vendió éstos, y cargó a Soler & Mascaró gastos y pérdidas. Dichas reposesiones y ventas se hicieron sin protesta u oposición de Soler & Mascaró, por lo regular con su conocimiento e intervención. Los gastos incurridos, así como las pérdidas liquidadas, se informaban por la demandada a Soler & Mascaró, y después de la quiebra, al Síndico.

"(41) El Tribunal concluye, con miras a los hechos probados, que la demandada Financial Credit no originó, o provocó, o finalmente precipitó el colapso económico y la quiebra de Soler & Mascaró.

"Aún cuando resolviéramos como cuestión de derecho que fueron ilegales o no autorizadas ciertas actuaciones que se imputan a la demandada por el Síndico demandante, la quiebra o colapso de "Soler & Mascaró" pudo ser el resultado de una serie de hechos, circunstancias y factores entrelazados manifestándose a la vez. Entre otras causas, están la de una capitalización insuficiente desde el origen; un desarrollo demasiado acelerado del negocio en comparación al capital disponible; actuaciones y normas erróneas de la propia corporación en el gobierno y manejo interno de su negocio, su política de gastos; el súbito aumento en sus costos de operación en forma sustancial con motivo de la instalación en el local del Edificio De Soto; la gran deuda contributiva que acumuló, lo cual la obligó a dedicar parte de sus ingresos corrientes a afrontarla; la pérdida del crédito bancario para su negocio al por menor y luego para su negocio al por mayor de importación; la pérdida de su agencia o representación como consecuencia de la pérdida de su crédito al por mayor; y muchos otros hechos y factores que se manifiestan a través de la evidencia admitida.

"(42) Juan Enrique Géigel, accionista y oficial de Financial Credit en momento alguno recibió remuneración de Soler & Mascaró para compensar servicios suyos como supervisor y representante de la demandada en los negocios de Soler & Mascaró. El Lcdo. Géigel había prestado y prestaba servicios profesionales a Soler & Mascaró desde su incorporación misma, con anterioridad a la organización de la corporación demandada."